Filed 5/7/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S076721 |
| v. | ) | |
| | ) | |
| WILLIAM ALFRED JONES, | ) | |
| | ) | Riverside County |
| Defendant and Appellant. | ) | Super. Ct. No. RIF73193 |
| _____ | ) | |

A Riverside County jury convicted defendant William Alfred Jones of the first degree murder of his elderly neighbor Ruth Eddings (Pen. Code, §§ 187, subd. (a), 189),[1] and further found true the three special circumstance allegations that the murder took place during the commission of rape, sodomy, and burglary (§ 190.2, subd. (a)(17)). The jury additionally convicted defendant of the arson of Eddings's home (§ 451, subd. (b)), and also found true various sentencing enhancement allegations — that defendant had two prior "strikes" (§§ 667, subds. (c) & (e), 1170.12, subd. (c)), had two prior serious felony convictions (§ 667, subd. (a)), and had served a prior prison term (§ 677.5, subd. (b)). Following the penalty phase of the trial, the jury returned a verdict of death. After conducting an automatic review and declining defendant's request to modify the

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

1

jury's verdict (§ 190.4, subd. (e)), the trial court sentenced defendant to death for the first degree murder count, and also imposed an indeterminate term of 25 years to life, with an additional determinate term of five years, for the arson count. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety, and order that the abstract of judgment be corrected to conform to the trial court's oral pronouncement as to the judgment on the arson count.

## I. FACTS

### A. The Guilt Phase

During the early morning hours of June 19, 1996, a fire was reported at the mobilehome residence of Ruth Eddings. After the fire was extinguished, her nude body was discovered lying facedown on the living room floor. An autopsy revealed that she had died before the fire started as the result of injuries consistent with blunt force trauma and strangulation.

Defendant, who lived with his parents in a mobilehome next door to Eddings, became the focus of the police investigation almost immediately. He was interviewed at home that morning and afternoon, and then interviewed at the police station later that evening and the following day. During the course of the questioning, defendant admitted responsibility for the fire and for Eddings's death. He also admitted to having sexual intercourse with Eddings and to ejaculating between her legs, although he was unsure if actual penetration occurred.

Because defendant admitted that he killed Eddings and set her residence on fire to conceal the death, the central issue for the jury to resolve at trial related to intent. The prosecution's theory of the case was that defendant committed burglary by entering the residence with the intent to sexually assault Eddings, and that he killed Eddings during the commission of rape and sodomy, or during an attempt to commit these crimes. The defense's theory was that defendant went to

2

Eddings's home simply "to make sure she was not hurt, or anything," that he was intoxicated at the time, and that her death resulted from defendant accidentally falling on Eddings. The defense maintained that defendant had no intention of killing or having sexual contact with Eddings when he went to her home, and that if any sexual assault occurred, it occurred postmortem.

1. *The prosecution's case-in-chief*

*(a) The murder and arson*

At the time of her death, Ruth Eddings stood four feet 11 inches tall, weighed 90 pounds, and was 81 years of age. She lived in Riverside County in a mobilehome next to defendant's parents, Mina and Bill Jones, with whom she had had a friendly relationship for almost 20 years. By defendant's own account, Eddings was "a nice person" who had treated defendant well, including paying him to do small jobs around her house.

At the time of the murder, defendant stood almost six feet tall, weighed approximately 200 pounds, and was 39 years of age. He had been living with his parents for a year and a half following his release on parole after serving more than four years in prison for two felony convictions for sexual assault on a minor. On the day of Eddings's death, defendant was home alone, as his parents recently had left on their first vacation since defendant moved in with them.

Riverside County Sheriff's Deputy Philip Matheny testified that he was on duty as a patrol officer in the early morning hours of June 19 when, at approximately 4:40 a.m., he was instructed to assist fire department personnel responding to a structure fire with possible people inside. After the fire was extinguished, investigators inspected the structure — a single-wide mobilehome trailer with attached outbuildings — and determined that the fire, which involved only the rear portion of the residence, had been started using accelerant in the

3

living room and inside the front door. A Camel cigarettes book of matches was found in the driveway, and the label of a Blitz brand gasoline container was lying in defendant's parents' yard near the chain-link fence that ran between the two properties. Eddings's badly burned body was discovered inside the trailer. She was unclothed, lying facedown with her legs spread apart and her head pointing away from the front door.

*(b) Defendant's statements to law enforcement officers*

Deputy Matheny testified that he made contact with defendant on the morning of the fire. Defendant told Deputy Matheny that he was staying with his parents, although they were in the State of Washington at the time, and that defendant had been sleeping when a young lady pounded on the window of his mobilehome, telling him there was a fire next door and requesting that he call the fire department.

Later that afternoon, defendant was interviewed at his parents' mobilehome by Riverside County Sheriff's Detective Eric Spidle. Donald Jones, defendant's brother, and Deputy District Attorney Patricia Erickson[2] were present during the interview, which lasted approximately two and one-half hours and took place while they sat at the kitchen table or walked around outside. Detective Spidle testified that when he asked defendant for matches, defendant handed him a matchbook with advertising for Camel cigarettes on the cover — the same advertising Detective Spidle had seen on the cover of the matches found earlier in Eddings's driveway. Another, similar book of matches later was found in defendant's bedroom closet. Also found on defendant's parents' property was a

---

[2] Deputy District Attorney Erickson was also the prosecutor at defendant's trial.

Blitz brand gasoline container — the same brand as the gasoline container label found earlier in their yard near the fence bordering Eddings's property. Detective Spidle also observed a "fresh" scratch on the side of defendant's face.

At the conclusion of the interview, Detective Spidle asked whether defendant would be willing to accompany him to the police station. Defendant agreed, and Detective Spidle drove him to the Riverside police station, arriving at approximately 4:00 p.m. Defendant waited in the reception area for half an hour until the deputy district attorney arrived, after which defendant was taken into a room with detectives and the deputy district attorney, and was advised of his rights to counsel and to remain silent. Defendant signed a written waiver of those rights, and Detective Spidle began to interview him.[3] Over the course of the session, the detectives offered defendant food, and gave him coffee, soda, and cigarettes. Defendant's demeanor varied from cooperative and inquisitive, to confused, nervous, and argumentative, and, in the detectives' opinion, he exhibited nonverbal signs of deception. Scratches on defendant's face, arms, hands, abdomen, hips, upper thigh, and legs were photographed, and the photographs were introduced as exhibits at trial.

At Detective Spidle's prompting, defendant detailed his activities prior to the fire. He explained that he had arrived home from work at approximately 6:00 p.m., and then went to a neighbor's house for about half an hour. Afterward, he drove to the store and purchased a 12-pack of beer and some groceries. When he returned home, he "cranked up the radio and just sat down and relaxed and drank a couple of beers." At approximately 8:00 or 8:30 p.m., defendant went

---

[3] Redacted tape recordings of the interrogation sessions were played for the jury during trial. The jury additionally was provided transcripts of the redacted recordings, which were entered into evidence as exhibits.

5

outside to wash his hands with gasoline in order to remove construction adhesive. He brought the gas can back to the house in case he needed it for his rototiller the following day.

Detective Spidle suggested defendant might have "drank too much" and "accidentally" started the fire, a claim defendant repeatedly denied, saying, "I would not hurt that woman." He claimed he had "no problem" with Eddings, that he "liked that lady," and that she had "always been sweet" to him. Defendant at first denied ever going over to Eddings's house the previous night, but when questioned regarding the gasoline, he suddenly "remembered" going over to "check on" Eddings at approximately 9:00 p.m., after noticing she had not taken the newspaper he had left for her on their common fence. Defendant said he knocked on Eddings's door and asked, "Are you alright?" and Eddings "yelled out . . . that she was in the tub." Defendant revised this story almost immediately, claiming instead that he walked over with a beer, jumped the fence, knocked on Eddings's door, said, "Ruth, it's me," but failed to get a response, then tried to open the door and found it locked, so he returned home. He insisted, however, that he did not enter Eddings's residence, that he drank only four beers the entire evening, and that he drank only two before going over to check on Eddings. When asked about the scratch on his face, defendant repeatedly claimed it occurred at work.

As the questioning continued, another detective stated that he had talked to defendant's brother Donald. Donald told the detective that he had "a real bad feeling" that with their parents gone and defendant being left home alone, something bad was going to happen, and that he purposefully had not asked defendant whether he "had done this" — referring to the homicide and arson — because Donald was afraid defendant had. Defendant expressed disbelief concerning Donald's statement, and asked to speak to his brother. The interview

6

continued, however, at which time defendant again changed his story about what had transpired the night before.

This time, defendant said he drank "at least six beers" before going over to check on Eddings at approximately 9:00 p.m. after noticing she had not taken the newspaper from the fence. When there was no response to his knocking, he opened the door, entered the trailer, and found Eddings lying on the floor naked. He "shook her head" and said her name, but Eddings did not respond. Noticing blood on her face and realizing she was dead, defendant "just freaked out." He went home and sat down on the couch: "[E]verything was running through my head . . . until . . . I got the gas can and I went over there and started the fire . . . [b]ecause I was scared . . . [bec]ause I don't want to go back to prison . . . I just didn't know what else to do . . . my fingerprints were all over." Defendant returned to Eddings's home three times, each time spraying lighter fluid or gasoline, before getting the fire to start. He repeatedly insisted, however, that he did not attack Eddings: "I did not murder this person. . . . I did not kill her. . . . I didn't hurt her." He told the detectives that he would "rather shoot myself" than go back to prison and asked for a gun so that he could "get this life over with."

When asked to account more specifically for the hours between 9:00 p.m. and 4:30 a.m., defendant stated that he "remembered" additional details. He said that between 9:00 p.m. and midnight, he "did nothing but just sit at home freaking" before deciding to change his clothes, get in his truck, and "split." As he was driving, however, defendant began to worry about his fingerprints being discovered in Eddings's trailer. He therefore returned to Eddings's trailer at approximately midnight and, after several attempts, finally set it on fire. Defendant then returned to his home and took a shower "to try to clear his head." Later that morning, he washed his clothes and shoes. When asked whether detectives were going to find evidence of bodily fluids on Eddings, such as

7

ejaculate, defendant said he might have dripped sweat on Eddings because sweat "was pouring off" his face when he turned her head, touched her wrist to see if she had a pulse, and put his head on her back to listen for sounds of breathing. He further admitted the scratch on his face had not occurred at work, but probably was from bumping into furniture in the darkness of Eddings's trailer. When asked about a bruise on his right hand, defendant thought he must have struck it on his way out of Eddings's trailer. But he continued to deny that there had been any kind of struggle or fight with Eddings.

Detective Spidle reviewed defendant's story a final time with him before terminating the interview at approximately 9:00 p.m. Defendant was placed under arrest and processed for booking into county jail, where he was received at approximately 1:40 a.m. The following evening, June 20, 1996, Detective Spidle brought defendant back to the Riverside police station and conducted a second taped interview session after defendant signed another written waiver of his rights. This interview lasted less than two hours.

At the outset, Detective Spidle told defendant he believed something physical had happened between defendant and Eddings, and asked defendant to "consider telling the complete truth," so that defendant's mother would not have to worry about there being "someone else out there." He also told defendant that he had talked to defendant's family and they did not believe his story, but rather thought "[defendant] did this."

After requesting and being allowed to speak to his mother by telephone, defendant admitted that he "hurt" Eddings. He said he went over to Eddings's residence and knocked on the door. Eddings was home and let him in: "Then, she threw her arms up and we got into wrestling match . . . . It got out of hand and I killed her." Defendant was "surprised" with how much Eddings fought back, and he agreed with the detective that she "put up a good fight." He described how he

8

choked her, while both of them were in a standing position, until she was unconscious. Defendant further admitted to sexually assaulting Eddings: "Yes, I did attack her. Yes, I killed her, and yes, I had sex with her. Yes." When asked if he had "wanted sex" when he went over to Eddings's trailer, defendant responded: "Yeah, I did at the time." He said Eddings was on her stomach and had ceased struggling when he put his penis "down between her legs" and, although he "couldn't tell if [his penis] was in or not," it "didn't take [him] very long to ejaculate." Defendant claimed Eddings "was alive before the fire," but that "she wasn't alive during the fire" because he remembered "checking." He thought the choking killed her, and he was convinced that he would be sentenced to death for his actions: "I already know I'm goin' to the death chamber . . . because I know the special circumstances in a murder."

*(c) The autopsy*

Dr. Robert DiTraglia, a forensic pathologist and the Riverside County coroner who conducted Eddings's autopsy, testified concerning the cause of her death — strangulation and blunt force trauma — and the extent of her injuries. Based on the number and severity of the injuries she suffered, the organs involved, and the amount of hemorrhaging associated with the injuries, Dr. DiTraglia estimated that it took two to 20 minutes for Eddings to die after suffering all of her injuries. Although she additionally suffered thermal damage to over 90 percent of her body, Dr. DiTraglia concluded that Eddings likely died before the fire started, because there was no evidence of soot in her airways, and the level of carbon monoxide in her blood was within normal limits. The density of Eddings's skeletal structure was within the normal limits for a woman of her age and, in Dr. DiTraglia's opinion, any existing osteoporosis had not affected the bodily injuries she suffered. Although Eddings had atherosclerosis, a hardening of the

arteries which is common in the elderly, Dr. DiTraglia did not believe this played a role in Eddings's death, confirming "[s]he did not die of a heart attack."

The extensive nature and severity of the thermal injury to Eddings's body caused by the fire — in some places, the skin and subcutaneous tissue were severely burned, in others places, there was no skin or subcutaneous tissue remaining at all — had a "profound effect" on the ability to recover certain types of evidence during the autopsy. As Dr. DiTraglia explained, "it's impossible to evaluate the presence of abrasions, bruises, lacerations when the tissue doesn't even exist." Dr. DiTraglia was able to recover some evidence from Eddings's body cavities. A small square piece of cloth with charred edges was pulled from her vaginal cavity. The manner in which the cloth was present in the vagina suggested it had been forced inside with a penetrating object. A swab of Eddings's rectal cavity also tested positive for defendant's semen, a circumstance defendant did not contest.

An internal examination of Eddings's chest cavity revealed 23 rib fractures located on all four sides of her ribcage, a series of injuries that Dr. DiTraglia described as "quite extreme" and "quite traumatic." In Dr. DiTraglia's opinion, these rib fractures could not have occurred from one impact, and could not have been caused by falling from a standing position. Rather, the number and location of the breaks to the ribcage evidenced "multiple impacts" from a force that was "significant, severe, and applied in multiple locations at multiple times." Severe hemorrhaging associated with the rib fractures further indicated that Eddings was alive at the time these injuries were inflicted.

Eddings also suffered a "dramatic" and "very severe" spinal fracture that displaced the spine, severed her spinal cord completely, and left her paralyzed, with no voluntary muscle movement, from the waist downward. A "tremendous amount" of force was required to produce this kind of blunt force trauma. As with

the rib fractures, extensive bleeding into the surrounding tissue associated with this injury indicated it was inflicted before her death. When asked whether the spinal fracture could have occurred from Eddings falling from a standing position, Dr. DiTraglia responded, "absolutely not."

Elsewhere, on the cervical spine, Eddings's neck was fractured in four places, as characteristic of strangulation. Dr. DiTraglia explained that while it is not uncommon for just one neckbone to break in a typical strangulation scenario, Eddings's case was extreme, as all four neckbones were fractured. There was hemorrhaging associated with all of the fractures, indicating that Eddings was alive when these injuries were inflicted. The unusual number of fractures indicated that a "compressive force" was applied to Eddings's neck "for some period of time." Dr. DiTraglia further explained that it takes approximately 60 seconds for death from strangulation to occur. Thermal damage to the neck area — the majority of skin and subcutaneous tissue was absent — destroyed any evidence of soft tissue injury caused by the strangulation. Similarly, microscopic examination of the brain for injuries consistent with strangulation, such as brain swelling, was precluded by thermal changes to the cerebral tissue resulting from the heat of the fire.

As part of the autopsy, the vaginal canal and the rectum were removed and dissected. As with other areas of Eddings's body, severe thermal injury to the skin and subcutaneous tissue surrounding the genitalia prevented an evaluation for the presence of external trauma such as abrasions, bruises, or lacerations. Neither did Dr. DiTraglia observe any internal trauma to the vagina or anal cavity, although visible charring to portions of the internal tissue inhibited his examination. The general absence of trauma to the genital area did not, standing alone, signify to Dr. DiTraglia that Eddings had not been raped or sodomized. He cited studies

11

indicating that of women who survived being raped, only 10 to 30 percent show genital trauma, and that the vast majority display no such indications.

Over defense objection, Dr. DiTraglia was permitted to testify as to his opinion that Eddings was raped and sodomized, and that she was alive at the time she was raped and sodomized. His opinion was based on the totality of the anatomical findings and evidence in this case, as well as Dr. DiTraglia's training and experience in cases of rape murder. This included, among other things, the array of Eddings's injuries consistent with being subdued by force prior to being sexually assaulted, the presence of a foreign object in Eddings's vagina apparently placed there by a penetrating object, the presence of defendant's sperm in her rectum, the prone position of Eddings's body when it was discovered, statements made by defendant, the rarity of necrophilia in Dr. DiTraglia's experience, and the circumstance that strangulation and blunt force trauma are "by far" the leading cause of death in rape murder cases. Dr. DiTraglia explained that because rape is both "a very intimate event" and an "inherently violent act," the cause of death typically is very intimate (choking versus gunshot wounds) and "the trauma, when it is present, is often severe and brutal, like it was in this case."

### (d) Evidence of other crimes

Over defense objection, the prosecution introduced evidence relating to an incident in 1990 in which defendant sexually assaulted minor Toni P. This evidence was admitted at the guilt phase for the limited purpose of evaluating defendant's state of mind and any specific intent he might have harbored on the evening Eddings was killed.

Toni P. testified that in March 1990, she was 16 years of age and had been living in Riverside County for almost a year in the residence of her uncle, John Seneff, and her aunt, Sandra Seneff, who was defendant's sister. The Seneffs' two

young children also were living in the house, as was Donald Jones, defendant's brother.

On the morning of March 16, after Sandra and John had left for work and the children had left for school, defendant arrived at the residence and spoke to Donald briefly. Donald then left for a job interview, leaving Toni P. alone with defendant for the first time since they had been acquainted. As she was preparing to leave the house, defendant asked Toni P. where she was going, and she replied that she was going to school. Defendant said, "No, you're not," put his hands on her shoulders, and pushed her through the hallway into a back bedroom. Once in the room, defendant pushed Toni P. to the floor, forcibly removed her clothes, pulled his own pants down, and put his penis in her mouth until he ejaculated, all the while holding her down on the floor as she cried and said "no" and "stop." Afterwards, he attempted to put his penis in her vagina, though Toni P. was not sure if penetration occurred. Defendant then stood up looking disoriented, pulled Toni P. to her feet, walked her into the bathroom, locked the door behind them, and handed her a wet washcloth for her face. After warning her not to say anything or she "would regret it," he left Toni P. crying in the bathroom. She immediately called a friend, who told her to report the incident to the police. Toni P. then changed her clothes and ran to the home of neighbors who were sheriff's deputies, and the neighbors called the police. Toni P. stated that she did not notice any indication that defendant was intoxicated during this incident.

2. *The defense's case*

*(a) Defendant's testimony*

Defendant briefly took the stand in his own defense. He testified that on the evening of Eddings's murder, he consumed two beers on his way home from work at approximately 4:30 p.m. on June 18, 1996, four or five more beers once at home, and then went to the store to buy another six-pack of beer, which he

13

consumed at home before going over "just to check up on" Eddings at approximately 9:00 p.m. He explained that he went to Eddings's home despite knowing she sometimes went to bed early and despite thinking that she might be in bed already. Holding an open can of beer, he knocked on Eddings's door. Eddings let him in, but then "went off" on defendant because he was drinking, knocked the beer can out of his hand, and began swinging at him. According to defendant, "It got out of hand and I killed her."

On cross-examination, over defense objection, the prosecution questioned defendant concerning his activities on June 18 and 19, in and around Eddings's residence, and his prior statements to law enforcement officers concerning those events. Also over defense objection, the prosecution impeached defendant with his prior felony convictions in the Toni P. case, and with certain prior incidents of assault.

Defendant admitted that he lied to Detective Spidle about several things during the course of his interviews. For example, he told Detective Spidle that he had not set the fire that night, and that he had not hurt Eddings and did not kill her, but none of this was true. He told Detective Spidle, as well as his brother Donald, that he went to Eddings's house and found her dead, but that was not true. Defendant also admitted he lied to Detective Spidle when he told him he was not drunk that night, and that he understated the amount of beer he had consumed.

Defendant further admitted to grabbing Eddings in the hallway and putting both his hands around her throat. He stated that he choked her, she went limp, and they fell. Defendant also admitted to having "sex" with Eddings, disrobing her, sticking his penis "down there," and ejaculating, but claimed he did not know whether vaginal or anal penetration occurred. When asked whether he strangled Eddings to death, defendant responded, "I guess so."

14

With respect to the Toni P. incident, defendant denied assaulting her. He recalled telling the arresting law enforcement officer in 1990 that he had not touched "that little girl" and that the last sexual encounter he had had was oral copulation by a prostitute. Defendant admitted, however, that he had been convicted of felony sexual assault with the intent to commit rape, and of felony forced oral copulation of Toni P.

Defendant also admitted that in September 1972, while he was in high school, he walked into a classroom and stabbed a teacher, Norma Knight, whom he did not know, several times in the back with a knife. He also admitted that in 1975, he went to the home of Barbara C., who was the mother of his girlfriend at the time, and "jumped on her," although he did not remember anything else about the incident because he was "on drugs real heavy" at the time.

On redirect examination, defendant admitted that he killed Eddings, but claimed that he had not gone to her house intending to kill her, nor did he go there intending to have sexual contact with her. Defendant said he had both hands on Eddings's neck when they began to fall, and used one hand to try to prevent the fall, but was unable to prevent his body from landing on top of hers. Eddings stopped breathing after they landed on the floor, and she was not breathing or moving when he put his penis between her legs. Defendant presumed the choking killed her because he "had her by the neck." When defendant spoke to Detective Spidle on June 20, he had not slept for three days, and had not eaten for 48 hours. He was "scared" and "hurting" over what had happened, and did not remember making all of the statements he made during the interview.

Defendant further testified that he had not intended to rape Barbara C., the mother of his girlfriend. He said he had a drug problem at that time, and had been using drugs on the day of the incident.

15

*(b) Forensic evidence*

Dr. Barry Silverman, a medical expert in anatomic and clinical pathology, testified concerning his review of the coroner's report of Eddings's autopsy, Dr. DiTraglia's trial testimony, photographs taken at the scene and at the coroner's office, and the police reports in the case. Dr. Silverman concurred that Eddings died of blunt force trauma and strangulation. His testimony focused on two issues: the amount of force required to cause Eddings's injuries, and whether or not penetration of her vaginal and rectal cavities had occurred prior to death.

Dr. Silverman testified that menopausal and postmenopausal women do not produce the hormone estrogen. Additionally, because Eddings had undergone a radical hysterectomy, she was not producing androgens, which in menopausal and postmenopausal women normally are converted into estrogen-like compounds. Her estrogen levels around the time of her death, therefore, would have been zero. The lack of estrogen in elderly women "causes profound changes in [their] bone structure." In this regard, in Dr. Silverman's opinion, Eddings showed signs of "severe" osteoporosis. Osteoporosis weakens the structure of the bones and makes them "much more" prone to fracture. Eddings further displayed symptoms of kyphosis or a hump in the spine, a condition that renders the vertebral column more prominent and, therefore, more prone to fracture.

In light of Eddings's bone structure, and considering that she was 81 years of age and weighed 90 pounds, and that defendant was over six feet tall and weighed 180 to 200 pounds, Dr. Silverman agreed with defense counsel that Eddings's traumatic injuries could have been caused by a single "tackling blow" in which defendant fell on her in a forceful manner. The injuries also were consistent with the application of a "bear hug" or "squeeze," followed by "a fall with weight on top of the fall." If Eddings's injuries had been caused by multiple blows, Dr. Silverman would have expected to see other evidence of blunt force

16

trauma. For example, punching or kicking blows "telescope into the body," such that organs deep in the rib cage, the spinal cord, the skin, and the muscles would be injured. Eddings's autopsy protocol, however, did not show any deep injury to her brain, lungs, heart, kidneys, liver, spleen, large intestine, small intestine, or stomach. Dr. Silverman would have expected those organs to display injury if Eddings had been subjected to "a savage beating." Additionally, although 90 percent of Eddings's body had been burned, thermal injury would not have affected the ability to detect subdural hematoma or deep organ injury, because house fires do not generate the degree of heat necessary to destroy all soft tissue. He conceded on cross-examination, however, that the fire would have destroyed any evidence of external bruising.

Dr. Silverman also explained how the cessation of estrogen production in menopausal and postmenopausal women affects the skin, causing it to become thinner and affecting its elasticity. In particular, the skin of the female genitalia "becomes cellophane thin in elderly females lacking estrogen" and "highly susceptible to trauma." Secretion of mucus in the female tract, which acts as a lubricant, also is negatively affected. Consequently, in the case of forcible rape that occurs before death, Dr. Silverman opined there should be "more significant injury" in a postmenopausal woman than in a woman of childbearing years. As noted earlier, during Eddings's autopsy, the female genitalia were removed and examined for signs of injury; no injury was observed. Dr. Silverman also indicated that if the cloth found in Eddings's vaginal cavity had been inserted prior to death, he would expect to see evidence of injury, such as blood on the cloth; none was reported. Similarly, if forcible sodomy had occurred prior to death, he would have expected to observe injury to the rectal cavity; none was found. He opined that thermal injury would not have affected the finding of such trauma, had it existed. Dr. Silverman further disputed the relevance of studies cited by

17

Dr. DiTraglia indicating that only between 10 and 30 percent of women in cases of rape sustain genital injuries. He opined that (1) the percentages referred to women who had survived rapes, and that rape murders are "much more brutal" and result "in more significant and severe injury," and (2) the characteristics of postmenopausal woman are different — Eddings's age and physical condition made her bones "very fragile" and her skin "paper thin." Given the brutal nature of the crime alleged in this case, Dr. Silverman expected "that there would be peroneal, vaginal and anal, rectal injuries." Consequently, he concluded that penetration of those areas in Eddings must have occurred after death.

### (c) Disputing the Toni P. incident

Riverside County Sheriff's Deputy Albert Ewens testified concerning his interview of Toni P. in response to the police call regarding defendant's sexual assault. Toni P. told Deputy Ewens that defendant had ejaculated in her mouth and that she had spit out the ejaculate. In an attempt to locate evidence to corroborate her story, Deputy Ewens went to the bedroom in the residence where Toni P. said the assault had taken place and, using his hands and eyes, carefully looked for, but did not find, any evidence of semen on the carpet. He admitted, however, that he did not use ultraviolet illumination to fluoresce any ejaculate.

Defendant's sister, Sandra Seneff, testified that she also visually searched for evidence of semen on the bedroom carpet but did not find any. Seneff stated that she did not trust Toni P. because Toni P. had admitted to falsely accusing another family member of molesting her.

### (d) Eddings's attitude toward alcohol

Helen Harrington, Eddings's daughter, testified that her mother did not keep alcohol in the house and did not drink alcohol. According to Harrington, "drunks" upset Eddings and she avoided them if possible.

### 3. *The prosecution's rebuttal*

On rebuttal, the prosecution presented additional evidence related to the Toni P. and Barbara C. incidents. Riverside County Sheriff's Deputy Brett Johnson testified concerning his arrest of defendant for sexually assaulting Toni P. After arriving at defendant's residence, but before Deputy Johnson had the opportunity to explain the charges to defendant, defendant said to him: "I didn't touch that little girl. I want to turn myself in and clear this up." Deputy Johnson then took defendant into custody and transported him to jail.

Following waiver of his *Miranda* rights, defendant told Deputy Johnson that because he had "partied pretty hard" the night before and felt "real wasted," instead of driving all the way to his home in Mead Valley, he had decided to stop at his sister's house in the Pedley area. According to defendant, he spoke to his brother Donald outside the house, then went inside to sleep. Deputy Johnson asked defendant when was the last time he had had sex, and defendant told him he had "picked up a hooker" earlier that morning and paid her $20 for oral sex. Upon hearing from other officers that a washcloth was being retrieved as evidence in the case, Deputy Johnson asked defendant why law enforcement would want to inspect the washcloth, and defendant replied that he did not know, but then said he had had a washcloth on his head like a cold compress while sleeping. Following a few moments of silence, defendant "blurted out, 'There was come on my shirt.' " Deputy Johnson asked how it got there, and defendant explained the prostitute had gotten semen on his shirt. Deputy Johnson asked where the shirt was, but defendant told him, " 'That's not going to do you any good. It's already been washed.' "

When Deputy Johnson told defendant that a rape kit sample would be collected, defendant asked to have a doctor present to confirm the existence of some scars on his penis, which defendant thought would assist in his defense on

19

the theory that anyone who had had contact with his penis should have noticed the scars. Deputy Johnson was present when the rape kit sample was taken. He observed a pink substance on defendant's penis; defendant explained this was calamine lotion he had applied that morning to try to heal the scars. Deputy Johnson also observed a "fresh" abrasion on one side of defendant's penis that was consistent with teeth marks. As part of the rape kit, the nurse swabbed defendant's penis. When defendant asked the purpose of the cotton swab, the nurse told him it was to collect evidence of vaginal secretions. Defendant then volunteered that he had touched the prostitute's vagina with his finger. Deputy Johnson asked what relevance this information had to possible presence of secretions on his penis, and defendant replied, "Yeah, I guess you're right."

Kathy White, a Riverside County Superior Court clerk, testified concerning a statement she heard defendant make during the Toni P. trial. During a lunch break following Toni P.'s testimony in that case, White overheard defendant talking to his brother David Jones outside of the courtroom. Defendant's brother asked him if Toni P. "was crying and carrying on." Defendant replied that she was not, that "it looked pretty good," and that he thought he was "going to beat this one too."

Finally, the prosecution played for the jury previously redacted sections of defendant's interviews with Detective Spidle. When Detective Spidle asked defendant about the incident with Toni P., he replied: "I don't know what it was. You know, all these years, you know, I had to live in that lie. . . . I don't know, then I was drinkin' a lot. . . . And . . . I was throwing money on hookers left and right. . . . Which, I thought, was better than gettin' in trouble, you know." When asked if "gettin' in trouble" meant "forcing yourself on some gal," defendant said, "Yeah. That and plus, you know, it was illegal for hookers." When asked what had happened with Barbara C., defendant replied, "Same thing, dope and beer and

20

stuff and —." Detective Spidle then asked, "But, I mean, what did you try to do, rape her?" Defendant replied, "Yeah." Detective Spidle also asked, "[T]he sexual urge that you have that . . . causes you to wanna . . . force sex on somebody like this . . . , it doesn't differentiate between younger women and older women, does it?" Defendant responded, "I guess, I guess not. It don't look like it."

### B. The Penalty Phase

#### 1. The prosecution's case in aggravation

During the penalty phase, the prosecution presented evidence of defendant's history of violent offenses against women. Eddings's daughter, two of her nieces, and a grandniece also testified concerning the impact of Eddings's death on her family, and, over defense objection, several family photographs were shown to the jury.

##### (a) Evidence of other crimes

##### (1) Norma Knight

In 1972, when defendant was 15 years of age, he stabbed Norma Knight, a high school teacher, in the back with a hunting knife. Robert Packer, the former principal at defendant's high school, testified that at the time of the attack, which took place the week before school was to begin, Knight was in her classroom alone when defendant, who had not been one of her students and whom she did not know, approached her desk and asked her the time. After she directed his attention to the clock on the wall, defendant continued to approach her desk and "the next thing she knew he had plunged a knife into her back and left the room." Thomas Lindley, the former vice-principal at the high school, testified that a week after the incident, Knight was shown a photographic lineup and identified defendant as the student who had stabbed her.

Defendant was charged with the stabbing as a juvenile. He was treated at a mental health facility for two years until his repeated escapes resulted in his

placement in juvenile hall. Defendant remained in juvenile hall until he was released from custody at the age of 18. Terry Garrison, a former girlfriend of defendant's and the mother of his three children, testified that defendant "laughed" when describing his attack on Knight.

Over a defense objection, victim impact evidence concerning Knight's stabbing was admitted. Lindley testified that Knight took time off from work following the incident and then returned for a period of time, but was "very frightened, very nervous, extremely apprehensive . . . in the context of her daily business," traits she previously had not exhibited on the job. She quit teaching later that same year and never returned to work. Tracy Knight — Norma's son — testified that following the incident, his mother had "a breakdown" one day while driving to school, thereafter was institutionalized in a mental health facility for one to two weeks, and had been under psychiatric care since that time.

*(2) Barbara C.*

In 1975, when defendant was 19 years of age, he assaulted Barbara C. in her bedroom. Barbara C., who had lived in the same neighborhood as defendant's family for 13 years and was the mother of defendant's girlfriend at the time, testified that she awoke one night in her bed to find defendant sitting on her chest with his hands around her throat "trying to strangle me." Struggling to breathe, Barbara C. managed to say, "Billy," at which time defendant stopped choking her and started to cry, saying he was on drugs or alcohol and needed help. Barbara C., who had not had a problem with defendant before this incident, said she would help him.

After defendant walked out of the bedroom, Barbara C. dressed and went into the living room to find him, but defendant had left. When she returned to her bedroom, she found a knife on her bed pillow that did not belong to her and had not been there when she went to sleep. Following this incident, defendant

committed himself for a few days to Patton State Hospital, a psychiatric hospital, and then checked himself out.

*(3)  Terry Garrison*

Terry Garrison testified concerning her four-year relationship with defendant.[4]  Garrison met defendant in 1975 when he was 19 years of age, had recently moved from California to St. Louis, Missouri, and was living with his uncle across the street from the restaurant where Garrison worked.  They began dating, eventually moving in and living together until January 1979.  Over the course of their relationship, defendant and Garrison had three children together, two girls and a boy, in addition to the two daughters Garrison had from a prior relationship.[5]

Sometime in 1977, the relationship between defendant and Garrison deteriorated, and defendant became physically and verbally abusive.  The mistreatment began with pushing and slapping, and eventually escalated to punching and kicking.  The violent encounters between defendant and Garrison were often, but not always, alcohol related, and appeared to occur whenever defendant "had had a bad day."  On one occasion, defendant hit Garrison in the head with an ax handle.  During another argument, defendant grabbed Garrison by the neck and threw her across the bed, asking, "Why don't you understand that I

---

[4]  On cross-examination, Garrison testified that she knew defendant was facing the death penalty and admitted that she was biased against him.  She said she "despised" defendant and, when asked to rate the intensity of this feeling on a scale of 1 to 10, she rated it an 11.  She also confirmed, however, that she would not testify falsely about defendant in order to ensure that he received the death penalty.

[5]  In 1981, all of Garrison's children were removed from her custody, and thereafter her three children with defendant were adopted by three different families.

love you?" Following a separate incident, Garrison had to go to the hospital for treatment for injuries to her head, an eye, and ribs inflicted by defendant.

In addition to the physical abuse, defendant also threatened Garrison, telling her that if she ever left him, "he would come and kill [her]." Defendant told Garrison of other acts of violence he had committed, such as when he was in the ninth grade and one of his teachers "made him mad so he stabbed her 21 times in the back with a paperweight," and also that he had been accused of trying to strangle a former girlfriend's mother.

Defendant and Garrison finally ended their relationship in January 1979. Defendant moved out of their residence and told Garrison he was moving back to California. He returned a month later to stay with Garrison for two or three weeks while she was five months pregnant with their son. One night during his stay, defendant shoved Garrison, face first, into a wall in the bedroom, then followed her into the bathroom and pushed her into the bathtub. He did not appear to Garrison to be using drugs or alcohol at the time, but rather was just "in one of his moods." Garrison went into labor and was taken to the hospital, where she prematurely gave birth to their son, who then remained in the hospital for several months. Garrison delivered their third child, a daughter, after she and defendant had separated.

After the relationship ended, Garrison received information from the department of family services that defendant might have molested her oldest daughter, Angela C. She called defendant and confronted him about these allegations. Defendant asked Garrison if she "really thought he was capable of something like that," to which she replied, "yes," and he laughed. Prior to this time, Garrison had never suspected defendant of abusing any of her children, because in her view, he was always a good father in her presence.

*(4) Angela C.*

Terry Garrison's daughter from a prior relationship, Angela C., testified as to the conditions in her household during the four years Garrison lived "on and off" with defendant. During this time, defendant and Garrison both drank alcohol and frequently would fight. Angela C. witnessed defendant slap Garrison, and she herself was physically beaten by both Garrison and defendant.

Angela C. described an incident in which she and her younger sister crossed the street against defendant's instructions. Defendant ordered the sisters into the house and forced them to disrobe and lay facedown on the floor with their arms and legs spread apart while defendant sat behind them for a period of time. Angela C. further testified that defendant started to molest her when she was four or five years of age. The first time, defendant was lying down on the couch and he called Angela C. over to him. He placed her on top of his groin and started rotating his hips. When she began crying, defendant told her "not to be a baby, that he knew [her] dad taught [her] how to do that, and he wanted [her] to take off [her] pants." Angela C. refused and asked to call her mother. Defendant telephoned Garrison at work, telling Garrison that she needed to come home. Garrison returned from work angry, and when Angela C. told her that defendant had wanted her to take off her pants, Garrison slapped her in the face and sent her to bed. Defendant and Garrison then had an argument.

On another occasion, when Angela C. was six or seven years of age, defendant was home alone with Angela C. and her sister when he instructed Angela C. to take her nightgown off and give it to her sister. Angela C. complied, but immediately put on another nightgown. Defendant ordered her to remove that nightgown as well and to come over to him. Angela did so, at which time defendant put her on his lap and raped her. When she screamed, defendant told her that he was punishing her "for being so curious." (Angela C. explained that

the "so curious" comment referred to a prior evening when she had walked in on her mom and defendant: "I heard some noises in the bedroom. I thought he was hitting her again, so I walked in there and they were having sex, and he made me sit on the chair [and watch] until they were done.") Defendant then put his finger in Angela C.'s vagina "to see if [she] was pregnant." She began bleeding from her genital area and defendant put her in the bathtub. Garrison returned home shortly thereafter and noticed blood in the bath water. Defendant told Garrison that Angela C. had cut her foot, and thereafter Garrison and defendant had "a big fight."

*(5) Tina Kidwell*

Tina Kidwell, formerly Perfater, testified concerning her two-year relationship with defendant. Kidwell met defendant in St. Louis in 1980, when she was 18 years of age and defendant was working with Kidwell's brothers. They dated for about six months before Kidwell and her baby son moved in with defendant. She moved out three months later, but they continued to see each other.

During the course of their relationship, Kidwell and defendant often drank alcohol together. Some incidents of violence occurred while they were intoxicated, but others occurred when defendant simply "had a bad day at work." During their relationship, Kidwell estimated that defendant hit her with his closed fists approximately five times. On one occasion, Kidwell and defendant had an argument, and defendant wanted her to leave the house, but Kidwell first wanted to get a bottle of milk for her son. Defendant shoved her outside and "slammed" the door behind her. He refused to let Kidwell back in, threatening to "beat [her] ass" and telling her to "get out" of there. During another incident, defendant, apparently dissatisfied with a meal Kidwell had prepared, overturned the kitchen table and pushed Kidwell across the room. Another time, defendant became angry

because Kidwell served chili that was not homemade. He threw the pot across the kitchen, shoved Kidwell, overturned the table, and then physically removed Kidwell from the house. A final incident occurred on Christmas Eve in 1982, while Kidwell was living in an apartment with her son and defendant was staying with them for a few nights. That evening, they had some neighbors over for a party. Defendant became jealous, put his fist through a window, and then left the house. Kidwell had no further contact with him after that incident.

After Kidwell stopped dating defendant, another woman, Elsie S., accused her of having a relationship with him. A fight ensued between the women, during which Kidwell cut Elsie S.'s face with a box cutter.

*(6) Elsie S.*

Elsie S. testified concerning her "on and off" relationship with defendant between 1982 and 1988. They met when Elsie S. was 21 years of age and living across the street from defendant's grandfather in St. Louis. The first time they were alone together, defendant took Elsie S. for a ride in his truck. Once parked, defendant tried to remove Elsie S.'s clothing, pulling her pants down, but she told him "no, stop." He stopped and then drove her home.

Two or three months later, defendant appeared at Elsie S.'s house, saying he wanted to talk to her and asking to take her for a ride. She complied but when they got out of the car, defendant grabbed her by the neck and pushed her into the backseat. As she struggled, defendant pulled her pants down, got on top of her, and raped her while saying, "you know you like it." Afterward, he drove her home. Elsie S. told her sister about the incident a week later, but did not tell anyone else because she "felt ashamed."

Elsie S. did not see defendant again for several months, after which she was with him at various times over the years and had sexual relations with him, sometimes voluntarily and sometimes not. She explained that she "was young and

27

naïve" and "felt like a little bit of affection was better than none." Toward the middle of their relationship, Elsie S. began to feel "used" by defendant and "hurt" that he did not feel the same way about her that she felt about him. They both dated other people at times during their relationship, which ultimately ended in 1988.

Although Elsie S. admitted to having consensual sex with defendant after they resumed a more regular relationship, she also recounted five or six other occasions when the intercourse with defendant explicitly was against her will. At various times, defendant tied her to the bed with masking or duct tape, put a knife to her throat, put his hands around her neck, inserted a foreign object in her vagina, gave her an unknown pill which caused her to become unconscious, and choked her with a pair of underwear until she could not breathe and had to tell defendant to stop. Elsie S. also called the police in 1986 when, during an argument, defendant punched her in the eye and held a knife to her blouse while threatening to "cut her beyond recognition." Police found a three-inch pocketknife in defendant's possession when he was arrested for this 1986 incident.

On cross-examination, Elsie S. testified that she instigated a fistfight with Tina Kidwell concerning defendant in 1988. The fight ended when Kidwell cut Elsie S.'s face with a box cutter.

*(7) Cathy D.*

In 1983, while living in St. Louis, defendant raped the girlfriend of an acquaintance. Cathy D. testified that on the night in question, she and her boyfriend, Harvey Temple, encountered defendant at a bar. Defendant was with another woman and the two couples decided to go to a restaurant for breakfast and then to defendant's residence. At some point the other woman left and Temple's wife arrived at the residence with their daughter. Temple left to drive his family home, and Cathy D. agreed to wait for him to return.

Defendant, who had been drinking, joined Cathy D. in the living room and told her that, in order to be alone with her, he had called Temple's wife. When Cathy D. rejected defendant's advances, he forcibly pulled her into the bedroom and threw her down on the bed, holding her arms down with one hand and unfastening and pulling down her pants with his other hand. Cathy D. struggled to get away from defendant, yelling at him to "let me go" and to "stop," but he told her to "shut up," pulled her underwear down, and raped her. Afterward, defendant said words to the effect of "that was good for me, was it for you?"

Cathy D. had to unlock the door to get out of the bedroom. As she was leaving defendant's residence, Temple called and Cathy D. told him to pick her up at a nearby parking lot. She told Temple what had happened but did not tell her family and did not report the incident to police. Cathy D. next saw defendant approximately eight months later when she and Temple were at a bar. When defendant saw Temple, he immediately left the bar, and Cathy D. never saw defendant again after that encounter.

*(8) Frances Stuckinschneider*

Also in 1983 in St. Louis, defendant assaulted and attempted to rape 62-year-old Frances Stuckinschneider.[6] At the time of the attack, Frances lived at the top of a two-unit duplex; her granddaughter, Sherry Melson, and Sherry's husband, James, lived below. Defendant's uncle, "Bill," who lived in the same neighborhood and did odd jobs for Frances, had arranged for defendant, known to Frances as "Willy," to do some work for her as well.

---

[6]    Because Frances Stuckinschneider died prior to defendant's trial, evidence relating to this incident was presented, over a defense objection, by her granddaughter, Sherry Melson, and Sherry's husband, James Melson.
     Hereafter, all references to Frances are to Frances Stuckinschneider.

Sherry testified that on the evening in question, she was at home alone when she heard someone enter the building and go upstairs to her grandmother's residence, after which she heard Frances talking to someone in the hallway. A short time later, she heard a loud "boom, boom, boom, boom, like someone was falling or running downstairs," and opened her door to see the screen door of the shared entryway closing behind the figure of a man.

Sherry went upstairs and found her grandmother with the top of her blouse unbuttoned and otherwise disheveled, nervous, upset, and angry. She asked her what had happened and Frances replied, "Willy tried to rape me." The two then went inside, where Frances, crying and shaking, told Sherry that defendant had asked for a glass of water, gone into her kitchen, returned with a knife in his hand, and told Frances that "he was going to fuck her." As defendant grabbed her breast and groped her between the legs, Frances told him that her granddaughter was downstairs and that her grandson was expected home at any minute. She also mentioned defendant's uncle Bill. As she was talking, Frances managed to work defendant toward, and finally out, her front door, after which he fled.

When James arrived home, Sherry informed him about what had happened. Later that evening, James went to confront defendant at his uncle's house, but was unable to locate him. Defendant's aunt called defendant's mother and told her that defendant had made sexual advances on Frances. Shortly thereafter, defendant left St. Louis and returned to his parents' residence in California.

Sherry further testified that Frances did not like to talk about the incident — for example, Frances did not mention to Sherry that she had been interviewed by Wesley Daw, an investigator for the prosecution, concerning the sexual assault in connection with defendant's trial. At the time of that interview, Sherry stated Frances was on medication that sometimes made her feel confused.

*(b) Victim impact evidence*

Over defense objection, four of Eddings's family members testified at the penalty phase:  Eddings's daughter, Helen Harrington; two of Eddings's nieces, Donna Velasquez and Ernestine Pierson; and Eddings's grandniece, Shirley Grimmett.  Additionally, 34 photographs of Eddings spending time with her immediate and extended family at birthday parties and other gatherings, were introduced through the testimony of these relatives.  The trial court sustained defendant's objection as to two of the photographs, admitting the remaining 32 into evidence.

*(9)  Helen Harrington*

Helen Harrington, one of Eddings's two daughters, testified that her mother was "everything" to her, and described Eddings as a "passionate" person who loved to garden, cook, bake, and do little things for her family and neighbors. Eddings remained generous as she aged, even sharing her own Social Security benefits.  Harrington visited her mother frequently, and they remained close until the time of Eddings's death.  Eddings also was very attentive to her grandchildren and great-grandchildren.  Harrington recounted telling Eddings's great-grandchildren about her death, and testified that the great-grandchildren missed Eddings and spoke of her frequently.

Harrington last saw her mother approximately 10 days before Eddings died, when she spent three days and two nights at Eddings's home.  Harrington described this as the "absolute best" time they had ever spent together.  Eddings finally was feeling "like her old self" after hip surgeries she had undergone, and the two shopped, dined out, reminisced about their childhoods, and sang hymns together.

On the morning of Eddings's death, Harrington received a telephone call from a neighbor that there had been a fire and her mother was deceased.  She

31

wondered why the Joneses had not called her, in light of the circumstance that they lived directly next door to Eddings.  At the time of the trial, Harrington still suffered from depression for which she took Prozac, and still experienced recurring nightmares about her mother's murder from which she would wake crying and in a cold sweat.  Harrington also described calling Eddings's phone number for more than one year after it had been disconnected, and beginning to talk to her mother before the recording announced the number was no longer in service.

Harrington and her sister were responsible for retrieving Eddings's belongings from the trailer after the fire, although "[t]here really wasn't too much to recover," because "[i]t was all pretty well burned."  She described crying and her feelings of sadness as she went through the remains of her mother's belongings.  Asked what she missed most about her mother, Harrington she replied, "Being able to confide in her, being able to know that she loved me without reservation.  She just — I could depend on her loving me.  I could depend on her being interested in what happened [in] my life, and the li[ves] of my children and grandchildren."  Harrington stated that there was no one in her life that could fill that role after her mother's death.

### (10) Donna Velasquez

Donna Velasquez, Eddings's niece, testified that Eddings was "a mother figure" to her.  She spoke of Eddings's generous nature:  "[W]e were very poor . . . and when I was seven my dad left, so then it was even worse.  And my aunt would also bring things over because we couldn't afford the milk or whatever.  [¶] I remember once when I was ten she bought me a beautiful red coat with gold-colored buttons.  That was very precious to me because she bought it."  Velasquez described how Eddings had always been there for Velasquez's family, particularly after Velasquez's mother died when Velasquez was 16 years of age.  Having spent

32

considerable time with Eddings while growing up, Velasquez was "devastated" to learn of her death, which left an unfilled void in Velasquez's life. Velasquez still thought often of Eddings — on birthdays, Christmas, or any occasion at all. She carried on a soothing practice that Eddings did with her, rubbing her grandchildren's earlobes while they sat in her lap. Velasquez described a collage she made of photos retrieved from Eddings's home — "burned edges and all" — and stated that she did not go out as frequently following Eddings's murder, because she worried that what had happened to Eddings could happen to her.

*(11) Ernestine Pierson*

Another niece, Ernestine Pierson, testified concerning Eddings's loving and considerate nature. Pierson and her husband visited Eddings approximately every two weeks, and sometimes more often. Because Eddings loved to bake, they rarely left Eddings's home without a piece of pie. Recalling a time when she visited Eddings in the hospital during Eddings's hip replacement procedure, Pierson stated of Eddings that the hospital staff "all loved her." She spoke of her feelings of shock and denial at the news of her aunt's death, and of emptiness in viewing the scene of the fire. Pierson "constantly" thought about the way Eddings died, and still found it "very difficult" to sleep imagining what Eddings went through. Both Pierson and her husband were close to Eddings, cried over her death, and still missed her and felt the pain of her loss.

*(4)      Shirley Grimmett*

The last family member to testify was Shirley Grimmett, Eddings's grandniece. She described Eddings as a "very sweet," "independent," and "funny lady," and confirmed that Eddings had "been there" when anyone needed her. Grimmett typically spoke with Eddings daily and Eddings always was very interested in Grimmett's family. Grimmett described how Eddings's death affected Grimmett's children. Her son Larry was "real upset," had trouble

sleeping, and missed Eddings "deeply." Grimmett's other son Steve was "very angry" and refused to talk about what happened to Eddings. Her daughter Karen and Karen's husband had marital problems for a month afterward because they would think about "all the torment and everything that [Eddings] had gone through" as a result of being raped. At the time of the trial, Karen still could not drive by Eddings's former home without "fall[ing] apart."

Grimmett learned about the homicide the day it occurred and drove to Eddings's home immediately. She recounted how devastated she was when she saw the burned ruins of the trailer — she sat and cried. Grimmett thought about Eddings's death "constantly." Whenever she heard or saw anything about a girl or woman being raped, she thought about what Eddings must have experienced.

### 2. The defense's case in mitigation

Defendant presented evidence at the penalty phase that attempted to discredit the other-crimes evidence. Family members also testified concerning his father's physical abuse of defendant and his brothers. Michael Kania, Ph.D., testified that defendant had a personality disorder and that his behavior changed when he drank or was under the influence of alcohol. Finally, evidence was presented concerning defendant's good behavior during his prior prison term.

#### (a) Disputing other crimes

##### (1) Terry Garrison, Tina Kidwell, and Cathy D.

Danny Davis, a defense investigator, testified concerning his interviews with Terry Garrison, Tina Kidwell, and Cathy D., in St. Louis. According to Davis, Garrison told him that she thought defendant was a good father to the children and did not mention anything about defendant molesting her daughter, Angela C. Garrison said that she and Jones regularly drank alcohol and smoked marijuana, that the majority of their physical confrontations occurred while they were under the influence, and that defendant regularly beat her.

Tina Kidwell told Davis she met defendant in 1981 and that they had been "boyfriend and girlfriend on and off" for two years, living together for three months during that time. Kidwell said defendant was "a very good father" and that he never acted inappropriately with her child or his daughter. The longer she and defendant were together, however, the more problems they had. Defendant liked to be in control of all aspects of their relationship. When defendant was sober, he was a very nice person, but when he drank alcohol, he changed. He sometimes would hit Kidwell, usually when he was drunk. Kidwell expressed surprise at the charges defendant faced in this case.

Cathy D. told Davis that she and defendant had been "drinking buddies" in 1982. She said defendant was a "very nice guy" when he was sober, but when he drank alcohol, which he did frequently, or used drugs, he was short-tempered and could be violent. She characterized the 1983 rape that occurred in defendant's residence as one in which defendant merely became "sexually aggressive" after her boyfriend left. Davis acknowledged on cross-examination that "a woman could be uncomfortable discussing rape with a man she did not know."

*(2) Elsie S.*

Mina Lee Jones, defendant's mother, testified that after Elsie S. and defendant ended their relationship, Elsie S. called her house several times looking for defendant. Mrs. Jones eventually told Elsie S. that defendant did not want to speak to her, and the calls ceased.

*(3)  Frances Stuckinschneider*

Wesley Daw, a prosecution investigator, testified concerning his interview with Frances in St. Louis in 1996, approximately six months before she died.[7]  Her son and 16-year-old grandson were present during the interview.  When Daw asked Frances about the prior "problem" she had with defendant, Frances told Daw that defendant had forcefully grabbed her by the legs and "got fresh" with her.  Her son asked her whether defendant touched her "private parts," to which Frances replied:  "Oh no-no-no-no, he didn't do nothing like that."  Daw asked Frances if defendant's actions "seemed to you like a sexual advance," to which Frances replied, "I would think so, yes."

*(b) Family history*

Defendant's older sister, Sandra Seneff, his mother, Mina Lee Jones, and two of his brothers, Richard and Donald Jones, testified concerning defendant's family history.  Defendant's parents had five children in the following order, with eight years between the oldest and youngest:  Sandra, Richard, defendant, Donald, and David.  Mr. and Mrs. Jones each completed only eight years of education, and both of them worked while the children were growing up, Mr. Jones during the day and Mrs. Jones during the evening.  Mr. Jones did not attend the children's school or sports activities.  He drank alcohol excessively and was physically abusive to the boys, at times severely beating them with his hands and a belt when he had been drinking.  Defendant and Donald received the worst of the abuse.  Their father, who was 6 feet two inches tall and weighed approximately 225 pounds, sometimes picked the boys up by their shirt collars and threw them

---

[7]    The interview was tape-recorded, and the audiotape was played for the jury during the trial.  The jury additionally was provided a transcript of the recording, which was entered as an exhibit.

36

against a wall or down the hallway. After the children reached their 18th birthdays, Mr. Jones often would get angry and order them out of the house — Sandra and Donald were expelled from the family home soon after turning 18 years of age. When he was 18 or 19 years of age, Richard was told to get a job immediately or leave the house.

After the Norma Knight stabbing incident, defendant was hospitalized at Ingleside Hospital in Rosemead, California. The doctors there told Mrs. Jones that defendant "could be dangerous to young girls and women." Defendant later was sent to juvenile hall because he kept "running away" from the hospital, and he remained in custody there until he turned 18. He received some counseling through the probation department after his release from custody. When he was 19, Mrs. Jones arranged for defendant to stay with relatives in Missouri because he was "unhappy" and "wanted a new start." Defendant thereafter lived in St. Louis, "off and on," for the next 20 years of his life.

Defendant, although "mischievous" and "hyperactive," was not violent as a young child and had never been abusive or aggressive toward family members. When he was sober, defendant was "congenial, loving, fun to be around." However, under the influence of alcohol or illicit drugs, defendant became "agitated," "nervous," "argumentative, and "generally that's when he ha[d] problems." Until the Norma Knight incident, defendant had never behaved in a violent manner to his family's knowledge. Barbara C. personally informed defendant's mother, Mrs. Jones, that defendant had assaulted her, and told her that defendant said he needed help, but Mrs. Jones was not able to provide him with help at that time. She did, however, warn her sister in St. Louis (defendant's aunt) about defendant's "problems" with women and when defendant came to live with her in California after serving his prison sentence for the Toni P. convictions, she also warned Eddings that defendant became aggressive when he drank alcohol.

Defendant's sister, Sandra Seneff, expressed disbelief about Toni P.'s allegations, although she had not expressed any doubt when she testified at the trial of the Toni P. charges. By comparison, Donald, who was the closest to defendant out of all the siblings, testified that the morning he left defendant home alone with Toni P., he felt so uncomfortable that, rather than attend his job interview, Donald returned home because he was concerned that defendant "would do something" to Toni P. Additionally, upon arriving at his parents' residence on the morning of Eddings's death and seeing defendant, Donald "knew just by looking at him that he was responsible" for what had happened, even though defendant at first denied any involvement.

Knowing defendant as he did, Donald never would have left defendant alone with Donald's ex-wife, girlfriend, or daughter, nor did Sandra Seneff want defendant to be around her children. Mrs. Jones confirmed that, prior to being arrested for Eddings's homicide, defendant was not allowed to be left alone with children in the family, in order "to protect him and to protect them."

*(c) Psychological evidence*

Clinical psychologist Michael Kania, Ph.D., testified concerning his evaluation of defendant. Kania met with defendant 10 times over the course of two years, administering a battery of psychological tests that included the Wechsler Adult Intelligence Scale, the Minnesota Multiphasic Personality Inventory, the Rorschach inkblot technique, and the Thematic Apperception Test. He also spoke to defendant's mother, sister, and brother, David. In evaluating defendant, Kania found it was "very difficult" to gain information from defendant, describing him as "distrustful" and afraid "that if he disclose[d] and open[ed] up to other people, then that [would] just be used and turned on him, and he [would] be punished for it." Defendant generally "couldn't bring himself to tell [Kania] those

38

things that he had done that were wrong or anything that would kind of reflect badly on his family."

Defendant's overall score on the intelligence test, 85, was in the "low average to borderline" range. Based upon the interviews and other test results, Kania concluded that defendant suffered from "a severe personality disorder with paranoid and dependent features," and an episodic "alcohol abuse or dependence problem," with alcohol constituting "a significant factor" in defendant's impairment. There was no indication, however, of organic or gross psychoneurological impairment in defendant's test results or in his medical or work history. There additionally was no evidence that defendant had a psychiatric disorder, and at no time was defendant required to be transferred to a mental hospital during the pendency of the case.

Kania found that defendant harbored significant anger and resentment, particularly toward his mother because she did not protect him from his physically abusive father. He had "high dependency needs" and "want[ed] to be close to people," but at the same time feared he would "be rejected or harmed in some way" by them. He dealt with anger, stress, frustration, and hostility by "putting a lid on it," but when he drank alcohol, defendant lost his "controls" and was unable to contain his anger — "that's when he [did] something that [was] either injurious to other people or to himself." Defendant therefore functioned best in situations that were free from alcohol, drugs, and conflicted relationships with women or his family, such as the structured setting of work or prison, where defendant's controls functioned well and he was able to meet clear behavioral expectations.

Kania explained that defendant generally expected women to reject him — "that they will see how inferior he is" — and interpreted their actions according to this preconception, even if it was incorrect. His abuse of women with whom he had relationships was consistent with this character trait, and drinking alcohol

magnified defendant's problems with women. Based on defendant's statements that he had consumed approximately 15 beers before his confrontation with Eddings, Kania concluded defendant was under the influence of alcohol when he attacked Eddings, and opined that defendant, in the face of what he perceived was an attack from Eddings, "lashed out angrily." He further understood defendant to have raped and sodomized Eddings "after she was dead as an expression of rage." Defendant expressed regret for what he had done to Eddings, and in Kania's opinion, did not show signs of being a person who was hardened to "the effect of his behavior on [others] and who actively goes out trying to hurt people."

*(d) Prior prison adjustment*

Mary Rector, a corrections case records manager with the Department of Corrections and Rehabilitation, testified concerning defendant's documented behavior during his prior prison term. According to the department's records, defendant received only a few informal "writeups" — one for sitting in class with his shoes on the desk, one for wearing sunglasses in class, and two for smoking in class. Notations in his file relating to his work performance generally were positive.

Spencer Stadler, a parole agent with the Department of Corrections and Rehabilitation, testified that after defendant's release from prison in September 1994, he was supervised on parole for a period of 21 months. During this time, defendant complied with his conditions of parole and committed no technical violations or new offenses.

Over objection by the defense, the People questioned Stadler regarding statements defendant made to him regarding Eddings's homicide. Defendant admitted to Stadler that he burned Eddings's residence, but said he had not harmed her and denied any sexual misconduct or physical violence. Defendant explained to Stadler that he had gone over "to check on" Eddings when he became

40

concerned she had not picked up the newspaper he normally left for her on their neighboring fence. Stadler stated that defendant told him he knocked on Eddings's door and, when no one responded, he entered the house only to find her nude body lying facedown on the floor. According to Stadler, defendant told him that he checked to see whether she was alive, then panicked and left the residence, driving away in his truck because he thought he would be returned to prison due to the nature of his prior incarceration. Defendant then decided to return to destroy any evidence of his having been in the trailer.

### 3. The prosecution's rebuttal

Wesley Daw testified concerning additional telephone interviews he conducted with Sherry and James Melson, Frances's granddaughter and grandson-in-law, in 1997, after Frances had passed away.[8] In his interview, James recounted that on the day of the incident between Frances and defendant, he had come home from work to find his wife, Sherry, frantic and very upset outside of the residence they shared with Frances. Sherry told him "someone tried to rape her grandma." They then both talked to Frances, who told them that "Will[y]" had entered her flat for a glass of water. James recounted that Frances stated that defendant "started talking kind of weird to her, you know, hey, I've always liked old ladies and you're kind of good looking . . . and then at one point he went into her kitchen and took out a butcher knife and told her he was going to fuck her and I think he grabbed her breast a couple of times" before Frances was able to maneuver him out of the door. Sherry, for her part, told James that she heard sounds of "clump . . . clump . . . clump down the stairs" and opened the door to

---

[8] The interviews were tape-recorded, and the audiotapes were played for the jury during the trial. The jury additionally was provided transcripts of the recordings, which were entered as exhibits.

see someone leaving. When she called upstairs to her grandmother, Sherry said that Frances immediately told her that defendant had been "trying to rape me."

In her interview with Daw, Sherry said that on the day in question, she had been sitting on the couch in the living room of her home when she heard a loud noise on the entryway steps leading up to her grandmother's flat. She went out into the hallway and called up to Frances, who was at the top of the stairs, "Grandma, what's going on?" and Frances said, "He tried to rape me." Sherry said, "Who are you talking about?" Frances responded, "Will[y]." Sherry went upstairs to comfort her grandmother, at which time Frances recounted what had happened just "seconds" before — that defendant had been in her kitchen to get a drink when "he started to come at her with a knife and told her that he was going to F her and that he had always had a thing for her." She also told Sherry that defendant grabbed her breast and groped her between the legs before she was able to direct him out the door.

Additionally, the prosecution played a brief portion of defendant's police interview that had previously been redacted. In it, defendant was asked about the incident in which Barbara C. woke up in her bedroom to find defendant, then 19 years of age, sitting on top of her. Defendant stated that he was "on dope . . . pot and drugs and all that shit" at the time and did not remember what happened. Regarding "that lady in St. Louis," defendant stated that Frances owed him "something like a hundred dollars" for work he had done on her house, and "that's when the accusation came out on that one . . . sexual something." Defendant further denied having attacked Frances.

## II. DISCUSSION

### A. Jury Selection Issues

Defendant makes several claims of error related to jury selection and the trial court's application of the standard for excusal set forth in *Wainwright v. Witt*

42

(1985) 469 U.S. 412 (*Witt*) and *Witherspoon v. Illinois* (1968) 391 U.S. 510 (*Witherspoon*).  Specifically, defendant challenges the trial court's excusal for cause of two prospective jurors — one during selection of the sitting jurors and one during selection of the alternate jurors — who expressed reservations concerning their ability to impose the death penalty.  He also challenges the trial court's refusal to excuse for cause five prospective jurors who, he claims, stated they would automatically vote to impose the death penalty if the charged crimes and special circumstance allegations were proved.  Defendant additionally contends that the prosecution improperly exercised peremptory challenges to remove any remaining potential jurors who had expressed misgivings about capital punishment, which he argues resulted in the exclusion of all prospective jurors who had expressed "strong opposition to, or conscientious scruples against, the death penalty."  Defendant alleges the cumulative effect of these alleged jury selection errors violated his right to a fair and impartial jury drawn from a representative cross-section of the community, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, and article I, section 16 of the California Constitution.  For the reasons discussed below, we conclude defendant's claims are without merit.

1. *Excusal of two prospective jurors for cause*

The prosecution challenged four prospective jurors for cause on the basis of their views concerning capital punishment, and the trial court, over defendant's objection, excused one, Prospective Juror C.B.  Without objection, the prosecution also successfully challenged two alternate jurors for cause, including Prospective Juror L.L.  Defendant asserts the excusal of Prospective Jurors C.B. and L.L. for cause, based on their alleged bias against the death penalty, was reversible error. We disagree.

*(a) Legal principles*

A prospective juror's personal views concerning the death penalty do not necessarily afford a basis for excusing the juror for bias in a capital case. (*Uttecht v. Brown* (2007) 551 U.S. 1, 6 (*Uttecht*) [" '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State,' [citation] . . ."].) Rather, "[t]o achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his . . . duties as a juror" ' in accordance with the court's instructions and the juror's oath." (*People v. Blair* (2005) 36 Cal.4th 686, 741, quoting *Witt*, *supra*, 469 U.S. at p. 424.) Under this standard, a prospective juror is properly excluded in a capital case if he or she is unable to follow the trial court's instructions and "conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. [Citations.]" (*People v. McWhorter* (2009) 47 Cal.4th 318, 340; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 987 (*Jenkins*).) The analysis is the same whether the claim is the failure to exclude prospective jurors who exhibited a pro-death bias, or wrongful exclusion of prospective jurors who exhibited an anti-death bias. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 906.)

During voir dire, jurors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve. When such conflicting or equivocal answers are given, the trial court, through its observation of the juror's demeanor as well as through its evaluation of the juror's verbal responses, is best suited to reach a conclusion regarding the juror's actual state of mind. (*People v. Hamilton* (2009) 45 Cal.4th 863, 890 (*Hamilton*).) " ' "There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient

that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 497-498.) "[T]he [trial court's] finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' [Citation.] Thus, when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " (*Uttecht*, *supra*, 551 U.S. at p. 7.)

A trial court's determination concerning juror bias is reviewed for abuse of discretion. (*People v. Abilez, supra,* 41 Cal.4th at pp. 497-498.) "[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor) gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451 (*Stewart*).). As such, "the reviewing court generally must defer to the judge who sees and hears the prospective juror, and who has the 'definite impression' that he is biased, despite a failure to express clear views." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1007 (*Lewis and Oliver*); see also *Uttecht*, *supra*, 551 U.S. at p. 9 ["Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors."].) Even when " '[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by

themselves compel the conclusion that he could not under any circumstance recommend the death penalty,' the need to defer to the trial court remains because so much may turn on a potential juror's demeanor." (*Uttecht*, *supra*, 551 U.S. at p. 8.)

In applying these principles, however, we must keep in mind that a prospective juror who is firmly opposed to the death penalty is not necessarily disqualified from serving on a capital jury. "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they *state clearly* that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176, italics added; see also *People v. Kaurish* (1990) 52 Cal.3d 648, 699 ["A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict."]; see *Stewart*, *supra*, 33 Cal.4th at p. 446.)

*(b) Analysis*

*(1) Prospective Juror C.B.*

In her questionnaire, Prospective Juror C.B. rated herself as "strongly against the death penalty" based on religious considerations related to her Christian background. She described her general feelings about the death penalty as follows: "I don't feel the death penalty is the appropriate action to take against a person. I do believe in punishment when the individual lives with the consequences of their actions. For example prison term [*sic*]." She also indicated in her questionnaire, however, that she would *not* "*automatically refuse* to vote in favor of the penalty of death and *automatically vote* for the penalty of life imprisonment without the possibility of parole, without considering any of the

evidence, or any of the aggravating and/or mitigating factors." She further confirmed she could not think of any reason she could not be a fair and impartial juror.

During voir dire for the selection of sitting jurors, the court asked Prospective Juror C.B. whether, in light of her feelings about the death penalty, she would "automatically tend to reject the penalty of death [and] automatically vote for life imprisonment regardless of the evidence." She twice responded that it was "hard to say." After several other prospective jurors were questioned by the court and counsel, during which time the duties and obligations of jurors in determining a penalty were explained to the panel in some detail, Prospective Juror C.B. told the prosecutor, "now I've heard the judge speak, I have a better understanding of it now. I would be fair. I would keep my own beliefs to myself." The prosecutor followed up by asking Prospective Juror C.B. whether she would be able to "walk into this courtroom, look at the defendant and say 'I sentence you to die. I sentence you to death.' " She responded, "I don't really know. It's tough. . . . I'm not very comfortable with it, but I would respect the law." The prosecutor again asked Prospective Juror C.B. whether she could "come back, look the defendant in the face, and say 'I sentence you to death,' " to which she replied, "Personally, I don't think I could do it just because of my beliefs." Asked more specifically whether she could impose a death sentence if she found the aggravating circumstances outweighed the mitigating circumstances, Prospective Juror C.B. indicated she was "[n]ot sure."

The prosecutor challenged Prospective Juror C.B. for cause, and over defense counsel's objection the court granted the challenge stating: "The Court's evaluation of [Prospective Juror C.B.'s] responses is that although saying ultimately at the end she didn't know what she would do, everything else about her answers and her body language made it unmistakably clear that she had a

position in this case with regard to the ultimate punishment.  And she did not appear to the court to be open to the possibility of considering equally, based on the evidence, the two possible alternative punishments in this matter."

As the above discussion demonstrates, Prospective Juror C.B.'s answers to questions directed at her potential bias concerning the death penalty were equivocal and conflicting, and indicated that she harbored very serious doubts concerning whether, if seated on a capital jury, she could ever personally vote to impose the death penalty.  She repeatedly and candidly admitted that she did not know or was not sure whether she could follow the law and consider all of the sentencing alternatives in light of her "strong" opposition to capital punishment based on her religious beliefs.  Those answers, in combination with the trial court's firsthand observations of her body language and demeanor, could give rise to a definite impression that C.B.'s views concerning the death penalty would substantially impair the performance of her duties as a juror.  At best, her equivocation in response to questioning requires that we defer to the trial court's assessment of her initial and ultimate state of mind.  We therefore conclude that the court acted within its discretion in excusing Prospective Juror C.B.  (Cf. *People v. Salcido* (2008) 44 Cal.4th 93, 134 [upholding dismissal of prospective juror for cause]; *People v. Roldan* (2005) 35 Cal.4th 646, 705 (*Roldan*) [same].)

Defendant argues that Prospective Juror C.B.'s answers suggested, at most, that she would have extreme difficulty imposing the death penalty, and contends that mere difficulty in this regard is insufficient to justify a *Witherspoon/Witt* excusal.  His citation to, and lengthy quotation from, *Stewart, supra,* 33 Cal.4th 425, in support of this premise, is inapposite.  There we confirmed that, when the court chooses to rely solely on a prospective juror's written questionnaire answers to justify excusal, the answers themselves must clearly indicate the juror's unwillingness or inability to determine the appropriate penalty under the

48

instructions.  We indicated that a brief written response to a question whether the juror's death penalty views would " 'prevent or make it very difficult' " to do so would not suffice.  (*Id.* at pp. 446–447 & fn. 12.)  Here, however, the court and both counsel subjected C.B. to substantial oral examination, and the court was able to observe C.B. during this process.  Under such circumstances, a juror's conflicting or ambiguous answers may indeed give rise to the court's definite impression about the juror's qualifications, and its decision to excuse the juror deserves deference on appeal.

*(2)  Prospective Alternate Juror L.L.*

Defendant also challenges the trial court's excusal for cause of Prospective Alternate Juror L.L.  The People contend that defendant forfeited any objection to the trial court's ruling on the basis of alleged *Witherspoon/Witt* error because in response to the prosecution's motion to dismiss Prospective Alternate Juror L.L. for cause, defense counsel submitted the matter to the trial court.  " 'Hence, as a practical matter, he "did not object to the court's excusing the juror, but . . . also refused to stipulate to it." ' [Citation.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 733.)  As we recently held in *People v. McKinnon* (2011) 52 Cal.4th 610, 643, "counsel (or defendant, if proceeding pro se) must make either a timely objection, or the functional equivalent of an objection, such as a statement of opposition or disagreement, to the excusal stating specific grounds under *Witherspoon*/*Witt* in order to preserve the issue for appeal.  Nevertheless, . . . because at the time of this trial we had not expressly held that an objection is necessary to preserve *Witherspoon*/*Witt* excusal error on appeal, we do not apply this rule here. [Citation.]"

In any event, we need not reach the merits of defendant's claim because Prospective Alternate Juror L.L. was under consideration solely as an alternate juror and no alternate jurors were ever substituted in defendant's case.  In *People*

49

*v. Bandhauer* (1970) 1 Cal.3d 609, 617-618, we held that the error, if any, in excluding a venireman by reason of his views on capital punishment was harmless beyond a reasonable doubt where, at the time of the ruling, the regular panel of 12 jurors had been chosen, the prospective juror was under consideration solely as an alternate juror, and, as matters turned out, no alternate juror was called upon to participate in the deliberations of the jury. (See also *People v. Terry* (1969) 70 Cal.2d 410, 416, fn. 1 [noting that although there were prospective alternate jurors who were excused on the ground of their opposition to the death penalty, no alternates were substituted for any member of the trial jury]; *People v. Risenhoover* (1968) 70 Cal.2d 39, 56, fn.6 [same]; cf. *In re Hill* (1969) 71 Cal.2d 997, 1097, fn.6 [defendants were prejudiced by dismissal of prospective alternate veniremen in violation *Witherspoon/Witt* because one alternate juror participated in the deliberations in the penalty phase].) Similarly here, any error in excusing Prospective Alternate Juror L.L. could not possibly have prejudiced defendant.[9]

---

[9] Defendant's citation at oral argument to *Gray v. Mississippi* (1987) 481 U.S. 648 is inapposite. In that case, the Court declined to adopt a harmless error analysis for the exclusion of a prospective *actual* juror in violation of *Witherspoon/Witt* even if the state retained unexercised peremptory challenges at the end of jury selection. (*Gray, supra,* at p. 664.) In so holding, it noted that the relevant inquiry in the harmless error analysis is " 'whether the composition of the *jury panel as a whole* could possibly have been affected by the trial court's error' " and concluded that the nature of the trial counsel's on-the-spot decisionmaking with respect to the use of peremptory challenges during jury selection "defies any attempt to establish that an erroneous *Witherspoon-Witt* exclusion of a juror is harmless." (*Gray, supra,* at p. 665.) By contrast, in the situation presented here, the alleged improper exclusion of a prospective *alternate* juror in a trial where *no* alternate juror sat on the jury, we can say with confidence that the composition of the relevant jury panel — the one from which the sitting jurors were selected — could not possibly have been affected by the trial court's alleged error.

Defendant challenged 10 prospective jurors on the basis of their views concerning the death penalty. The trial court granted five challenges, but denied the challenges as to Prospective Jurors E.R., P.P., P.N., B.D., and M.B. Defendant now contends the trial court erred in denying his motions to excuse for cause the five "death inclined" prospective jurors and forcing him to use peremptory challenges to excuse these jurors. However, defendant, without objection, accepted the jury as finally constituted with five peremptory challenges remaining. "As a general rule, a party may not complain on appeal of an allegedly erroneous denial of a challenge for cause because the party need not tolerate having the prospective juror serve on the jury; a litigant retains the power to remove the juror by exercising a peremptory challenge. Thus, to preserve this claim for appeal we require, first, that a litigant actually exercise a peremptory challenge and remove the prospective juror in question. Next, the litigant must exhaust all of the peremptory challenges allotted by statute and hold none in reserve. Finally, counsel (or defendant, if proceeding pro se) must express to the trial court dissatisfaction with the jury as presently constituted." (*People v. Mills* (2010) 48 Cal.4th 158, 186; see also *People v. Davis* (2009) 46 Cal.4th 539, 581 (*Davis*) ["the existence of unused peremptory challenges strongly indicates defendant's recognition that the selected jury was fair and impartial"]; *Hamilton, supra,* 45 Cal.4th at p. 892 ["it is possible that, despite counsel's initial misgivings about the composition of the jury, he ultimately was satisfied with the jury as sworn, and, had he expressed dissatisfaction, the trial court may have allowed him to exercise additional peremptory challenges"].) Here, although defendant used peremptory challenges to excuse Prospective Jurors E.R., P.P., P.N., B.D., and M.B., he did not exhaust his peremptory challenges during jury selection, nor did he communicate to the trial court any dissatisfaction with the jury ultimately

impaneled. Defendant's claims of error as to these five prospective jurors, therefore, were not preserved for appeal.

### 3. The prosecution's exercise of peremptory challenges

Of the 22 peremptory challenges exercised by the prosecution, defendant contends that "most, if not all," were exercised against prospective jurors who had expressed reservations against the death penalty, and that this violated his right to a fair and impartial jury because it "purged" the panel of the life-inclined jurors that remained after the trial court's rulings on the challenges for cause. In order to preserve this claim for appeal, defendant was required at trial to object to the prosecutor's use of peremptory challenges. (*People v. Champion* (1995) 9 Cal.4th 879, 907; *People v. Hill* (1992) 3 Cal.4th 959, 1005.) He failed to do so and thus forfeited any claim of error regarding such use.

Even assuming it were not forfeited, and that the prosecution in fact exercised all its peremptory challenges based on the prospective jurors' views concerning capital punishment, this claim still would fail on the merits. As defendant acknowledges, "we have repeatedly rejected any claim of constitutional infirmity in a prosecutor's use of peremptory challenges to remove jurors with reservations about the death penalty." (*People v. Morris* (1991) 53 Cal.3d 152, 186; see, e.g., *People v. Ochoa* (2001) 26 Cal.4th 398, 432 ["Because both parties may exercise peremptory challenges to remove jurors with unfavorable attitudes, the practice does not produce a jury biased toward death."].)

### B. Guilt Phase Issues

### 1. Admission of evidence of other crimes and related jury instructions

Defendant claims that the trial court erred in admitting evidence related to the sexual assault of Toni P. because it constituted improper character evidence and additionally should have been excluded as more prejudicial than probative under Evidence Code section 352. He further argues that this asserted error was

compounded because the jury instructions improperly permitted the jurors to consider the attacks on Norma Knight and Barbara C. for purposes of determining defendant's intent upon entering Eddings's residence. Such errors, defendant alleges, violated his federal constitutional rights and resulted in prejudice. These contentions are without merit.

*(a) Background*

Before trial, defendant filed a motion in limine to exclude evidence of any "uncharged acts" on the grounds that this would constitute improper character evidence under Evidence Code section 1101, subdivision (a), and would be more prejudicial than probative under Evidence Code section 352. In response, the prosecution moved to introduce testimony related to the Toni P. case and the Frances incident, arguing that the evidence was admissible under Evidence Code sections 1101, subdivision (b), and 1108, because it tended to show defendant's intent and common scheme or plan when he entered Eddings's home, as well as his propensity to commit sexual offenses. The trial court ultimately ruled that evidence relating to the Toni P. case (but not defendant's resulting conviction) would be admissible at the guilt phase on the limited issue of intent with respect to the burglary special circumstance allegation, and that Evidence Code section 352 did not otherwise limit the admissibility of this evidence. In so ruling, the court observed that the Eddings and Toni P. offenses both involved sexual assaults accomplished within a short period of time after gaining access to the victim. In particular, the trial court found the rapidity with which defendant acted to accomplish his sexual assault once alone with Eddings and Toni P. was corroborative of his intent to sexually assault Eddings while she was alive. Evidence relating to the Frances incident, however, was ruled inadmissible on the grounds that, in the absence of a contemporaneous account by Frances of the incident, the evidence was, at best, ambiguous concerning the issue of intent.

53

As discussed more fully at the outset of the opinion, Toni P. testified during the prosecution's case-in-chief that when she was 16 years of age, she was alone with defendant one morning in his sister's house when defendant pushed her into a bedroom and forced her to perform an act of oral copulation. Pursuant to the trial court's pretrial ruling, the jury was not informed of defendant's prior conviction. Additionally, the prosecution did not present evidence regarding any uncharged act of misconduct, and the statements defendant made to law enforcement officers regarding the Frances and Barbara C. incidents were redacted from the audiotapes played for, and transcript provided to, the jury.

However, the situation changed when defendant exercised his right to testify. The prosecution argued that the other incidents of misconduct involved "acts of moral turpitude" and therefore were admissible for impeachment purposes under *People v. Wheeler* (1992) 4 Cal.4th 284. The trial court ruled that defendant could be impeached with evidence of his prior conviction related to Toni P., as well as with evidence of the attacks on Norma Knight, Barbara C., and Cathy D.[10] In so ruling, the court determined that the evidence was not more prejudicial than probative under Evidence Code section 352, and that the sentencing enhancement allegations related to the prior convictions would no longer be bifurcated.

When cross-examined by the prosecution regarding these matters and as described above, defendant admitted that in 1972, he walked into a classroom of a teacher whom he did not know and stabbed her in the back. He also admitted that in 1975, he went to Barbara C.'s house at night, found her asleep, and "jumped on her," but claimed he was under the influence of drugs at the time and denied he

[10] Although the trial court ruled defendant could be cross-examined regarding his rape of Cathy D., the prosecution did not introduce such evidence during the guilt phase.

intended to rape her. With respect to Toni P., defendant admitted that he had been convicted of felony assault with intent to commit rape and of forced oral copulation; he denied, however, committing those two crimes.

The prosecution further introduced documents relating to defendant's prior prison commitment pursuant to Penal Code section 969b. The court overruled defendant's Evidence Code section 352 objection, reasoning that the prior prison term was admissible under article 1, section 28 of the California Constitution on the issue of defendant's credibility, involved a crime of moral turpitude and a felony as to which defendant explicitly denied responsibility, and was related to the testimony of a witness who was offered by the prosecution under Evidence Code section 1101, subdivision (b).

On rebuttal, the prosecution was permitted to call the Riverside County Sheriff's Department deputy who arrested defendant in connection with the Toni P. case. As described above, the deputy testified concerning various statements defendant made as he was arrested and as the rape kit sample was collected. Also called to the stand was a Riverside County superior court clerk who testified concerning the statement she heard defendant make to his brother while outside of the courtroom during the Toni P. case — that he thought he was "going to beat this one too." The prosecution further was permitted to play previously redacted portions of defendant's taped interview with Detective Spidle. When asked about the incident with Toni P., defendant stated: "[A]ll these years, you know, I had to live in that lie." Defendant further admitted to Detective Spidle that he tried to rape Barbara C., and that the sexual urges he had that caused him to want to force sex on someone did not differentiate between younger women and older women.

*(b) Analysis*

*(1) Evidence related to the Toni P. case*

The rules governing the admissibility of evidence of other crimes are well settled. Although evidence of prior criminal acts generally is inadmissible to show bad character, criminal disposition, or probability of guilt, such evidence may be admissible when relevant to prove some material fact other than the defendant's general disposition to commit such an act. (Evid. Code, § 1101, subd. (b).) "As Evidence Code section 1101, subdivision (b) recognizes, that a defendant previously committed a similar crime can be circumstantial evidence tending to prove his identity, intent, and motive in the present crime. Like other circumstantial evidence, admissibility depends on the materiality of the fact sought to be proved, the tendency of the prior crime to prove the material fact, and the existence *vel non* of some other rule requiring exclusion." (*Roldan, supra,* 35 Cal.4th at p. 705.) An exception to the general rule against admitting propensity evidence is Evidence Code section 1108, subdivision (a), which provides for the admissibility of evidence of other sexual offenses in the prosecution for a sexual offense, subject to Evidence Code section 352. "[T]he Legislature's principal justification for adopting section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations. Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915 (*Falsetta*).)

In this case, evidence related to the defendant's sexual assault on Toni P. was admitted under Evidence Code section 1101 during the prosecution's case-in-chief to show defendant's intent in the present case.[11] "To be admissible to show intent, 'the prior conduct and the charged offense need only be sufficiently similar to support the inference that defendant probably harbored the same intent in each instance.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1194.) Additionally, the probative value of the proffered evidence must not be substantially outweighed by the probability that its admission would create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (Evid. Code, § 352.) At the time of defendant's trial, the constitutionality of Evidence Code section 1108 was pending review before this court in *Falsetta, supra,* 21 Cal.4th 903. In light of the circumstance that the trial court found the Toni P. evidence admissible under Evidence Code section 1101, subdivision (b), it declined to admit the evidence under section 1108 so as to "avoid issues on appeal." Subsequent to defendant's trial, we upheld the constitutionality of Evidence Code section 1108. (*Falsetta, supra,* 21 Cal.4th at pp. 907-908, 910-922.)

Regardless of the admissibility of the challenged evidence under Evidence Code section 1101, subdivision (b), there was no error in the Toni P. evidence being considered by the jury because it was admissible under Evidence Code section 1108 to show that defendant had a predisposition to commit the sexual

[11]    When Toni P. testified during the prosecution's case-in-chief, the trial court instructed the jury that her testimony could be considered only for the limited purpose of "evaluating the state of mind of [defendant] on June 19th, 1996, including the state of mind and the existence or nonexistence of the specific intent which may be an element of the crime charged or of the special circumstances which are alleged in this case."

offenses in this case.  (See *Davis, supra,* 46 Cal.4th at p. 603, fn. 6; see also *People v. Smithey* (1999) 20 Cal.4th 936, 972 (*Smithey*) [" ' " '[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason.  If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.'  [Citation.]"  [Citation.]' "].)  Admissibility under Evidence Code section 1108 does not require that the sex offenses be similar; it is enough the charged offense and the prior crimes are sex offenses as defined by the statute.  (*People v. Frazier* (2001) 89 Cal.App.4th 30, 41.)  That criterion is clearly met here.

With respect to Evidence Code section 352, we agree with the trial court that the substantial probative value of the evidence from the Toni P. case was not outweighed by the likelihood it would prejudice the jury.  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 404-407.)  Evidence from the Toni P. case was probative of defendant's propensity to commit sexual offenses, and to refute the claim that he formed the intent to sexually assault Eddings only after killing her.  (*Falsetta, supra,* 21 Cal.4th at p. 915 ["evidence that [the defendant] committed other sex offenses is at least circumstantially *relevant* to the issue of his disposition or propensity to commit these offenses"].)  The source of information — Toni P. herself — was independent from the Eddings case.  The attack resulted in defendant's convictions for forcible oral copulation and assault with intent to commit rape.  Although serious crimes, they certainly were not more serious or inflammatory than the charge that defendant raped, sodomized, paralyzed, viciously beat, and strangled Eddings to death before setting her house on fire.  (See *People v. Lewis* (2009) 46 Cal.4th 1255, 1287 (*Lewis*).  Nor were the Toni P. offenses too remote in time — there was only a six year gap between defendant's attacks on Toni P. and Eddings, and defendant was incarcerated for the Toni P.

convictions for all but 18 months of that time. (See, e.g., *People v. Foster* (2010) 50 Cal.4th 1301, 1330 (*Foster*); *Davis, supra,* 46 Cal.4th at p. 603; *People v. Turner* (1994) 8 Cal.4th 137, 200; *People v. Daniels* (2009) 176 Cal.App.4th 304.) Finally, because the Toni P. offenses constituted the only "other crimes" evidence admitted in the prosecution's case-in-chief before defendant elected to testify and put his credibility at issue, they were clearly not cumulative. Accordingly, the trial court acted within its discretion in finding the evidence of the Toni P. offenses substantially more probative than prejudicial.[12]

*(2) Jury instructions concerning evidence of other crimes*

As noted, evidence related to defendant's sexual assault of Toni P. was admitted initially to show intent. When defendant elected to testify, the trial court further ruled that his credibility could be impeached with the Toni P. conviction, as well as with his stabbing of Norma Knight and attempted rape of Barbara C. The trial court's instructions to the jury, however, were not entirely consistent with its rulings on the scope of admissibility of these prior crimes.

At the time the prosecution cross-examined defendant about the three incidents, the trial court instructed the jury as follows: "There was testimony early on, a couple weeks ago from [Toni P.], and then again today there has been testimony from [defendant] about incidents that occurred before June 19th or 18th, 1996. You may consider those incidents for a limited purpose. [¶] At this point in time, with regard to the incidents that [defendant] has testified to, you may

---

[12] Defendant also argues that the assertedly erroneous admission of the Toni P. offenses denied him various rights guaranteed by the Fourteenth Amendment of the United States Constitution, such as the right to due process, as well as his right to a reliable adjudication at all stages of a death penalty case, and that he suffered prejudice. Because we find no error concerning the admission of the Toni P. offenses, these claims necessarily fail.

consider those incidents insofar as they may weigh on your determination of the witness's credibility. The fact that an individual, for example, has been convicted of a felony offense or has committed a criminal act evidencing dishonesty or moral turpitude may be considered by you in weighing the credibility of such a witness. [¶] . . . [¶] *In addition to that*, you may consider such evidence if it has a tendency to show the existence or nonexistence of the required specific intent or mental state which is an element of the crime or special circumstance which is charged in this particular case. At least at this point in time, and for no other purpose, you may consider such evidence." (Italics added.) Defense counsel made no objection to this instruction.

At the conclusion of the guilt phase, at the request of both parties, the trial court instructed the jury pursuant to CALJIC No. 2.50 as follows: "Evidence has been introduced for the purpose of showing that the defendant committed crimes other than those for which he is currently on trial. Such evidence, if believed, was not received and may not be considered by you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. Such evidence was received and may be considered by you only for the limited purpose of determining, if it tends to show, the existence on or about June 19th, 1996, of the specific intent or mental state which is a necessary element of the crime or special circumstance charged. For these limited purposes and as I previously instructed you with regard to the credibility of witnesses, you must weigh such evidence in the same manner as you do all other evidence in the case. You are not permitted to consider such evidence for any other purpose."[13]

---

[13]     Prior to giving CALJIC No. 2.50, the trial court instructed the jury pursuant to CALJIC No. 2.23.1 as follows: "Evidence has been introduced for the purpose of showing that a witness, [defendant], engaged in past criminal conduct

*(footnote continued on next page)*

Defendant now claims these instructions were erroneous because they failed to distinguish between the offenses introduced for the limited purpose of determining defendant's intent — the Toni P. assault — and the evidence admitted for the limited purpose of impeaching defendant's credibility as a witness — the Norma Knight, Barbara C., and Toni P. assaults. As a result, defendant asserts, the jury was allowed to consider evidence of his stabbing of Norma Knight and his attempted rape of Barbara C. for purposes of assessing his intent to sexually assault Eddings, when that evidence was admitted only for impeachment purposes.

As a general matter, CALJIC No. 2.50 does not misstate the law, and the evidence supported the giving of the instruction. Defendant moreover not only failed to object to the instructions he now complains of, but also affirmatively requested that CALJIC No. 2.50 be given, without seeking any clarification concerning which prior crime had been introduced for what purpose. In any event, setting aside the questions of whether the trial court erred and whether defendant invited the error by requesting the instruction without modification, any error was harmless. It is not reasonably probable that defendant would have obtained a more favorable result if the jury had been instructed in a clearer manner concerning which prior crimes were admitted for the limited purpose of determining defendant's intent in committing the charged offenses and the special

---

(footnote continued from previous page)

indicating dishonesty or moral turpitude. This evidence may be considered by you only for the purpose of determining the believability of that witness. The fact that the witness engaged in such past criminal conduct, if it is established, does not necessarily destroy or impair the witness' credibility or believability. It is, however, one of the circumstances that you may take into consideration in weighing the testimony of that witness." Defense counsel made an unspecified objection to this instruction.

61

circumstances, and which prior crimes could be considered for the limited purpose of assessing defendant's credibility as a witness. (*People v. Green* (1980) 27 Cal.3d 1, 44 [evaluating the trial court's error in failing to reopen the case under the "reasonable probability" standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836].)

First, there is no dispute that Norma Knight's stabbing and Barbara C.'s attempted rape were admissible as past criminal conduct indicating dishonesty or moral turpitude that the jury could consider for the purpose of determining defendant's credibility. The Barbara C. incident furthermore was admissible under Evidence Code section 1108 as evidence of a prior sexual offense that demonstrated defendant's propensity to commit sexual offenses. Second, there was direct and circumstantial evidence strongly supporting the conclusion that, contrary to his denials at trial, defendant's intent upon entering Eddings's residence was to sexually assault her. This included defendant's admission to law enforcement officers that he went to Eddings's home for the purpose of forcing sex on her, the expert opinion of the forensic pathologist who conducted Eddings's autopsy that Eddings was raped and sodomized before she died, and defendant's previous sexual assault of Toni P. Third, during closing argument, the prosecution was careful to distinguish between the specific limited purposes for which each prior crime had been admitted.[14] Defense counsel in his closing argument

---

[14] For example, the prosecution argued: "In determining whether [defendant] is truthful and credible, you can consider what he did to the teacher Norma Knight when the defendant was in high school. . . . [¶] In determining whether or not defendant was truthful when he said 'I only went over to check on Ruth Eddings like a good neighbor,' you can consider what he did to Barbara C[.]. . . . [¶] When you consider what defendant's intent was when he went over to Ruth Eddings'[s] house, you can consider what he did to Toni P[.] and appreciate the parallels between what happened to Toni P[.] and what happened to Ruth Eddings

*(footnote continued on next page)*

highlighted the distinction as well.[15]  It therefore is not reasonably probable that, in the absence of any lack of clarity in the jury instructions as to which prior crimes were admitted on the issue of intent, defendant would have obtained a more favorable result.

Defendant alternatively argues that the assertedly erroneous jury instructions violated his federal constitutional rights.  This claim also is without merit.  As noted, there was no error in the admission of the Norma Knight and Barbara C. assaults.  Any mistake in the related instructions concerning the purpose for which the jury could consider this evidence, would not constitute a violation of defendant's due process rights, because the instructions did not "infect[] the entire trial."  (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 ["It is well

---

*(footnote continued from previous page)*

. . . ."  During its rebuttal argument, the prosecution further stated:  "[D]efendant admitted what he did to Norma Knight, stabbing her in the back.  He admitted what he did to Barbara C[.], attempted to rape her.  You can consider that for the believability of the witness in everything he said when he was on the stand, including his testimony in court that he didn't go over to Ruth Eddings'[s] house to have sex.  [¶]  You can consider the incident involving Toni P[.] and all the evidence relating to Toni P[.]'s assault in considering the defendant's intent when he went over to Ruth Eddings'[s] house."

[15]      For example, the defense argued:  "Well, you're going to get some instructions on prior felony allegations in this case. . . .  [Y]ou heard Toni P[.], you heard about Norma Knight, Barbara C[.]  [¶]  And, ladies and gentlemen, resist, resist, resist — because it's against the law for you to take the easy way out and to say, my word, if he did those acts before, sure is easy for me to believe that he did it this time too.  Well, ladies and gentlemen, the judge is going to instruct you that that . . . is not evidence that he did the crime as alleged by the prosecution this time.  It may demonstrate that my client has serious mental problems, emotional problems, character problems, but it's not evidence that he came in and did what the prosecution is alleging, that is, intended to enter Miss Eddings'[s] residence to rape her, to sodomize her."

established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record."].) The strong evidence of intent and the arguments of counsel, which advised jurors to consider defendant's assaults of Norma Knight and Barbara C. for the limited purpose of assessing his credibility, lead us to conclude that the instruction did not corrupt the factfinding process. On this record, any error in the jury instruction did not affect defendant's federal constitutional rights to a fair trial, to present a defense, to due process of law, and to reliable determinations of the issues of guilt and penalty. (*Foster, supra,* 50 Cal.4th at p. 1335.)

    2.  *Admission of expert opinion that the victim had been raped and sodomized before death*

    Defendant claims that we must reverse the guilt phase judgment because the trial court erred in permitting Dr. Robert DiTraglia, the forensic pathologist and Riverside County coroner who conducted Eddings's autopsy, to testify concerning his opinion that Eddings was raped and sodomized, and that this occurred "before death." Defendant contends that Dr. DiTraglia did not have any specialized education, training, or experience qualifying him as an expert "in this particular area"; his testimony lacked foundation and exceeded the scope of his expertise as a forensic pathologist because it was based on "extrinsic" factors instead of anatomical findings; the opinion was not the proper subject of expert testimony because it was not helpful to the jury; the opinion was more prejudicial than probative under Evidence Code section 352; and that defendant suffered prejudice as a result of the admitted testimony. Finally, defendant claims the error in admitting Dr. DiTraglia's opinion also violated defendant's federal constitutional rights. We conclude that each of defendant's arguments is without merit, as discussed below.

*(a) Background*

When the prosecutor first asked Dr. DiTraglia for his opinion concerning whether Eddings had been raped and sodomized, defense counsel objected that such testimony was "outside the scope of this expert's opinion" in light of Dr. DiTraglia's testimony "about other indicators being absent," and that the question therefore called for speculation. The trial court did not sustain the objection, but suggested that there was a lack of foundation for the question, after which Dr. DiTraglia clarified, under questioning by the prosecution, that over the course of his career, he had seen "a number of cases" involving homicide victims who had been raped and sodomized.

The prosecutor next asked Dr. DiTraglia for his opinion concerning whether Eddings was alive at the time she was raped and sodomized. Defense counsel objected that, "based on the status of the evidence as we have it on the record, there's insufficient data for this expert to render an opinion." The court did not sustain this objection either, but opined that the question "assume[d] facts not in evidence at this point in time." The prosecutor rephrased the question, asking Dr. DiTraglia for his basis in forming an opinion concerning whether or not Eddings was raped or sodomized, to which Dr. DiTraglia responded as follows: "Everything that I know about this case, some of it we've talked about today, some of it we haven't talked about directly — for example, DNA evidence and sexual assault evidence — my training and experience in cases of rape-murder, the sorts of things that happen when people are raped and murdered, the cause of death, the circumstances of death, my experience in rape-murder versus if I understand your question correctly, you're asking me to evaluate necrophilia, which would be sex with a dead person, which is exceedingly uncommon. So I would say my training and experience, textbooks and literature, all of the evidence

that I know about what happened in this particular case is what I would use to formulate an answer to your question."

The court then instructed the jury pursuant to CALJIC No. 2.80 regarding expert testimony,[16] and asked Dr. DiTraglia additional questions relating to his qualifications. Under the court's questioning, Dr. DiTraglia reiterated that one of his responsibilities as a forensic pathologist was to express an opinion on the cause of death, that he had testified approximately 150 times in court, and that on several previous occasions, he had been asked to express an opinion in court as to whether or not the individual upon whom he had performed an autopsy had been the victim of a sexual assault.

Following this exchange, the prosecutor resumed questioning, and she again asked Dr. DiTraglia whether he had an opinion concerning whether Eddings was raped. Defense counsel objected on the grounds that the question called for

---

[16] The court instructed the jury pursuant to CALJIC No. 2.80 as follows: "Ladies and gentlemen, let me remind you of something that . . . I know I instructed you on during the jury selection process but have not reiterated since we've been listening to the testimony of witnesses, that is, that a witness who has special knowledge, skill, experience, training, or education in a particular subject has testified already and is now in the person of Dr. DiTraglia testifying today, and there may be other individuals of a similar ilk. They may testify concerning opinions. Any such witness may be referred to as an expert witness. [¶] In determining what weight to give an opinion expressed by an expert witness, you should consider the qualifications and the believability of the witness, the facts or materials upon which each opinion is based, and the reasons for each opinion. [¶] An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses upon the reasons it is based. [¶] You are not bound to accept the opinion expressed by any such witness. You should give the opinion whatever weight you think it deserves. If you find it to be an unreasonable opinion, not founded upon facts, you may disregard it."

an opinion that was outside the scope of the witness's expertise, "especially given his recent testimony about necrophilia. There's been no evidence introduced at this time that he has any training in psychiatric or psychological anomalies upon which he would have to base that opinion, to wit, that sex with a dead person is exceedingly uncommon."

The trial court then permitted defense counsel to question Dr. DiTraglia extensively on his qualifications in "this specific area." Dr. DiTraglia testified that although he had not had any "formal training" or "special on-the-job training" concerning necrophilia outside general reading in forensic literature, in his experience as a forensic pathologist — which included personally performing 3,000 to 3,500 autopsies over the course of a 10-plus-year career — necrophilia was uncommon, such that he had never had the opportunity to conduct an autopsy on a corpse that had been the victim of necrophilia. He also reiterated the multifaceted approach to formulating an opinion concerning whether a corpse had been the victim of a rape murder, including talking to law enforcement personnel, visiting or viewing photographs of the crime scene, the results of the autopsy, the presence or absence of trauma, foreign objects in the body cavities, and sexual assault evidence such as sperm, proteins, and DNA, understanding the connection between rape and murder, and the circumstance that the most common cause of death in rape murder cases is strangulation, often coupled with blunt force trauma.

When direct examination resumed, Dr. DiTraglia was asked for and testified concerning the opinions that are at issue here — that Eddings was raped and sodomized, and that she was raped and sodomized "before death."

*(b) Analysis*

*(1) Expert's qualifications*

Defendant contends that Dr. DiTraglia's opinion was inadmissible because he had no specialized education, training, and experience qualifying him as an

67

expert in determining whether a sexual assault on a deceased victim was committed prior to or after death. To support this claim, he points to Dr. DiTraglia's lack of background in psychology, psychiatry, necrophilia, criminology, and crime scene reconstruction. This contention lacks merit.

Evidence Code section 720 provides that a person may testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates," and that "[a] witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony." The trial court's determination that a witness qualifies as an expert is a matter of discretion that will not be disturbed absent a showing of manifest abuse. (*People v. Bolin* (1998) 18 Cal.4th 297, 321-322 (*Bolin*).) We will find error regarding a witness's credentials as an expert only if " ' "the evidence shows that a witness *clearly lacks* qualification as an expert . . . ." ' (Italics in original, [citations.]" (*People v. Chavez* (1985) 39 Cal.3d 823, 828.)

There is no dispute that Dr. DiTraglia was qualified as a forensic pathologist. Defendant suggests, however, that an opinion concerning the timing of Eddings's sexual assault could have been given only by a psychologist or psychiatrist specializing in necrophilia, or one qualified as a criminologist or crime scene reconstructionist. We disagree. "A forensic pathologist who has performed an autopsy is generally permitted to offer an expert opinion not only as to the cause and time of death but also as to circumstances under which the fatal injury could or could not have been inflicted." (*People v. Mayfield* (1997) 14 Cal.4th 668, 766 [experienced forensic pathologist was qualified to give an opinion on regarding whether victim's fatal wound could have been inflicted in the manner described by the defendant without leaving tattooing or stippling around the wound]; *People v. Robinson* (2005) 37 Cal.4th 592, 631 (*Robinson*) [rejecting

argument that only a crime scene reconstructionist could opine about the position of gunshot victims, where testifying forensic pathologist possessed extensive familiarity with gunshot wounds].)  The question of whether a victim was raped and sodomized prior to or after dying is a relevant circumstance of death for which a qualified forensic pathologist might offer an opinion in an appropriate case.  We further note that defendant's rebuttal witness on this issue, Dr. Barry Silverman, a medical expert in anatomic and clinical pathology who opined that penetration of Eddings's vaginal and rectal cavities occurred postmortem, also appears to lack the particular expertise that defendant claims was lacking to support Dr. DiTraglia's contrary opinion.

The record moreover establishes that the challenged opinion fell within the ambit of Dr. DiTraglia's particular education, training, and experience.  In his 10-plus-year career, Dr. DiTraglia had performed 3,000 to 3,500 forensic autopsies, including a number in cases involving homicide victims who had been raped or sodomized prior to being murdered, and had testified in approximately 150 court cases, including several in which he had been asked to express an opinion concerning whether the individual upon whom he had performed an autopsy had been the victim of a sexual assault.  He additionally had the particular experience of personally performing Eddings's autopsy, and conducting a contemporaneous review of studies regarding rape and trauma, in formulating his opinion concerning the cause, manner, and circumstances of her death, including whether she had been raped and sodomized prior to dying.

The two cases cited by defendant, *People v. Hogan* (1982) 31 Cal.3d 815 and *People v. Williams* (1992) 3 Cal.App.4th 1326, are distinguishable from the present case.  In *Hogan*, a criminalist, although qualified to give an opinion concerning the source of various bloodstains, was erroneously allowed to offer additional "blood spatter" testimony, when the criminalist had no education or

training regarding blood spatters and had never performed any laboratory analysis to make blood spatter determinations. Rather, he merely had observed bloodstains at certain crime scenes and determined in his own mind whether they were "spatters" or "wipes" without ever verifying his conclusions in any way. (*Hogan, supra,* at pp. 852-853.) Similarly, in *Williams*, an arresting officer in a driving-under-the-influence case, although having sufficient expertise to recognize nystagmus (involuntary rapid movement of the eyeball), was not qualified to express an opinion regarding the cause of nystagmus, because he had no training in chemistry, physiology, or any other subject related to how alcohol affected the human body or how nystagmus occurs after the ingestion of alcohol. (*Williams, supra,* at pp. 1330-1331.)

By contrast, the opinion at issue did not require Dr. DiTraglia to have expertise beyond that which was shown — that he was a veteran forensic pathologist with extensive experience and familiarity with rape murder cases. Once an expert witness establishes knowledge of a subject sufficient to permit his or her opinion to be considered by a jury, the question of the degree of the witness's knowledge goes to the weight of the evidence and not its admissibility. (*Bolin, supra,* 18 Cal.4th at p. 322.) The criticism that Dr. DiTraglia lacked more specific or in-depth knowledge of necrophilia, therefore, goes to the weight of his opinion, not its admissibility. But the trial court did not abuse its discretion in overruling defense counsel's objection and finding Dr. DiTraglia qualified to opine that Eddings was raped and sodomized before death.

*(2) Foundation for expert opinion and scope of expertise*

Defendant alternatively claims that Dr. DiTraglia's opinion concerning the timing of Eddings's sexual assault lacked foundation and exceeded the scope of his expertise as a forensic pathologist because it was based not upon findings of physical injury to Eddings's genital area, but rather upon other "extrinsic" factors,

70

such as the presence of a foreign object in the vagina, the presence of sperm in the rectum, the cause of death as blunt force trauma and strangulation, the circumstances of the crime scene including the position of Eddings's body, and defendant's statements to law enforcement.  This contention also fails.

To the extent defendant argues that the so-called extrinsic information that Dr. DiTraglia relied upon was not "of a type that reasonably may be relied upon by an expert in forming an opinion" (Evid. Code, § 801, subd. (b)) concerning whether a victim was raped and sodomized before dying, he does so without citation to any authority supporting this assertion.  This contention moreover is contradicted by Dr. DiTraglia's uncontested testimony that examining *all* of the evidence — physical, anatomical, extrinsic, or otherwise — is precisely what a forensic pathologist does in forming an opinion regarding the cause, manner, and circumstances of a victim's death.  To the extent defendant argues that the evidence did not support Dr. DiTraglia's conclusion that Eddings was murdered during the commission of rape and sodomy, he was free to explore any perceived weaknesses in the factual foundation for the opinion during cross-examination, which defense counsel did.  But there is no basis for holding that the trial court abused its discretion in admitting the challenged opinion.

*(3)  Propriety of subject matter for expert testimony*

Defendant alleges that Dr. DiTraglia's challenged opinion was not the proper subject of expert testimony because it was not helpful to the jury.  He argues that Dr. DiTraglia was no more qualified than the jurors to examine the "extrinsic" evidence considered, and that he simply drew a conclusion that amounted to nothing more than his "personal opinion" that the jurors equally were equipped to draw.  Having rejected defendant's claim that Dr. DiTraglia was unqualified to render the challenged opinion, we further reject the claim that Dr. DiTraglia's opinion was not the proper subject of expert testimony.

Evidence Code section 801 qualifies a matter as the proper subject for expert testimony if it is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." That is not to say, however, that the jury need be wholly ignorant of the subject matter of the expert opinion in order for it to be admissible. (*People v. Fudge* (1994) 7 Cal.4th 1121 [rejecting claim that expert's opinion was not a proper subject for expert testimony because the jurors could have decided for themselves whether the victims were trapped between a fence and parked cars].) Rather, expert opinion testimony " 'will be excluded only when it would add *nothing at all* to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness" ' [citation]." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.)

For example, in *People v. Farnam* (2002) 28 Cal.4th 107, we held that it was proper for the criminalist to testify about the sequence of events even if "common sense" supported his conclusion that the victim was strangled where her body was found, because it could not be said that the expert's testimony would not have assisted the jury. (*Id.* at p. 163.) Similarly, in *Robinson, supra,* 37 Cal.4th 592, we held that expert testimony of the forensic pathologist — his opinion that although the shooter might have assumed any number of positions when placing the gun perpendicular to the crown of the victim's head, it was most likely that the shooter was standing next to a kneeling victim because that was the least awkward position — would have assisted the jury in determining whether the killing was premeditated and deliberate, and in assessing the credibility of corroborating witnesses. (*Id.* at pp. 630-631.)

As the medical examiner who performed Eddings's autopsy, Dr. DiTraglia recovered the cloth from Eddings's vagina and defendant's DNA from her rectal cavity. The circumstances of death were consistent with a struggle, overwhelming

the victim either by force or otherwise, and subduing the victim prior to subjecting her to rape and sodomy. Based on his own professional experience, Dr. DiTraglia further connected the intimate manner of Eddings's death — strangulation and savage blunt force trauma — to the most common scenario for a murder committed during the commission of rape. He also knew from experience that necrophilia was "exceedingly uncommon." He understood that the substantial thermal damage which destroyed nearly all of Eddings's skin and subcutaneous tissue, additionally could have destroyed evidence of injury to Eddings's genitals. Moreover, his contemporaneous review of sexual assault studies revealed that of women who survived being raped, only 10 to 30 percent show genital trauma, and conversely, the vast majority of rape victims do not. Dr. DiTraglia also took into consideration the manner in which Eddings's body was found — on the floor, unclothed and lying facedown with her legs spread apart — and defendant's incriminating statements to law enforcement officers.

Applying his knowledge, skill, experience, training, and education to all the evidence presented, Dr. DiTraglia reached the conclusion that Eddings had been raped and sodomized, and that these acts had taken place before she died. This opinion provided an informed forensic context that went beyond the jurors' common fund of information and could have assisted the jury in determining defendant's intent and timing in sexually assaulting Eddings, which was relevant to the special circumstance allegations that the murder took place during the commission of rape, sodomy, and burglary. Accordingly, the opinion was the proper subject for expert testimony, and the trial court's decision to admit Dr. DiTraglia's testimony was not error.

*(4)   Challenging the expert opinion under Evidence Code section 352*

Finally, defendant contends that Dr. DiTraglia's opinion should have been excluded under Evidence Code section 352 as more prejudicial than probative.

73

This claim has been forfeited, however, by defense counsel's failure to make this specific objection at trial. (Evid. Code, § 353, subd. (a); see also *Bolin, supra,* 18 Cal.4th at p. 321.) Contrary to defendant's assertions, an objection that an expert is unqualified to render an opinion is not the equivalent of an objection that the opinion is more prejudicial than probative.

Even assuming the claim was preserved for appellate review, we would reject it on the merits. "[U]ndue prejudice is that which 'uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues.' [Citations.]" (*Robinson, supra,* 37 Cal.4th at p. 632.) "Evidence is not 'unduly prejudicial' under the Evidence Code merely because it strongly implicates a defendant and casts him or her in a bad light, or merely because the defendant contests that evidence and points to allegedly contrary evidence." (*Ibid.*) As noted, Dr DiTraglia's opinion that Eddings was raped and sodomized before she died was highly relevant to defendant's intent and timing in sexually assaulting Eddings and to the special circumstance allegations that the murder took place during the commission of rape, sodomy, and burglary. Although disturbing, this was the clinical conclusion of a medical expert, not the type of evidence uniquely designed to evoke an emotional or irrational response from jurors. The jury, moreover, was instructed not to be influenced by passion, sympathy, or prejudice and to conscientiously consider and weigh the evidence in applying the law. If presented with an objection to Dr. DiTraglia's opinion based on Evidence Code section 352, the trial court would have acted within its discretion in finding that the probative value of the testimony outweighed the risk of prejudice.[17]

---

[17] Because we find no error in the admission of Dr. DiTraglia's opinion, defendant's claims that he was denied various rights guaranteed by the Fourteenth

*(footnote continued on next page)*

Finally, even assuming error in the admission of Dr. DiTraglia's testimony concerning the timing of defendant's sexual assault of Eddings, such error was harmless under any standard. We have stated that "[i]ntercourse after death does not necessarily negate the felony-murder rule or the rape-murder special-circumstance finding, as postmortem intercourse could constitute an attempt to commit rape, provided it was part of a continuous transaction and the intent to commit rape was formed prior to the murder." (*People v. Booker* (2011) 51 Cal.4th 141, 175.) It therefore does not matter if actual penetration did not occur until after death as long as the defendant had the required specific intent before the victim's death. Here, there was ample evidence that defendant entered Eddings's residence to sexually assault her and thus formed the intent to rape Eddings before her death. This included defendant's own admission to law enforcement officers that he went to Eddings's home for the purpose of forcing sex on her, his prior sexual assaults of Toni P. and Barbara C., and the evidence that Eddings left scratches on defendant's abdomen and thigh (most likely while he had his pants off and she was resisting his sexual assault). The only evidence to the contrary is defendant's highly dubious testimony, which was directly contradicted by his own statement to the police. As such, the admission of Dr. DiTraglia's testimony, even if erroneous, was harmless beyond a reasonable doubt. (See, e.g., *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

---

*(footnote continued from previous page)*

Amendment of the United States Constitution, and that he suffered prejudice due to the erroneous admission of this evidence, necessarily fail.

*3.    Exclusion of evidence related to defendant's mental health*

Defendant claims the trial court erred in excluding, at the guilt phase, the proposed testimony of clinical psychologist Michael Kania describing defendant's personality disorder and the effects of alcohol intoxication on him, and in striking testimony related to defendant's prior mental health hospital commitments.  He asserts that these rulings were based upon an improper interpretation of section 29 as prohibiting evidence relating to "diminished actuality or intent."  Defendant contends this evidence was critical to his defense because it would have provided the jury with insight into his thought processes, and would have explained why he might have reacted violently to Eddings with little or no provocation, even though he did not harbor any preexisting intent to harm her.

Defense counsel sought to introduce Kania's testimony *after* the defense rested its case.  As discussed further below, we conclude that the trial court did not abuse its discretion in declining to reopen the guilt phase of the trial.  And because evidence of defendant's hospitalization had been admitted in anticipation of Kania's testimony, which never materialized, the trial court furthermore did not abuse its discretion in striking such evidence.  Even assuming to the contrary, it is not reasonably probable that any claimed error in this regard affected the outcome of the trial.

*(a) Background*

At a hearing on pretrial evidentiary and procedural matters, defense counsel advised the trial court that he had consulted with Kania "early on" in the case, but had not decided whether to call him as a witness.  The trial court, noting that defendant was not raising any psychiatric defense, suggested Kania testify in the penalty phase, "not for the purpose of justifying [defendant's] conduct but explaining and mitigating his behavior."  In response to the prosecutor's concern about timely discovery, the court further admonished the defense to disclose any

relevant discovery in order to avoid substantial continuances. Later during the trial, on the day before the defense was to start its case, counsel confirmed that Kania remained a possible witness, but that Kania had not completed his report.

The next day, defense counsel advised the trial court that he intended to call Kania as a defense witness but still had not received a report from him. When asked whether Kania was prepared to testify that defendant suffered from some mental disease, defect, or disorder at the time of Eddings's death, defense counsel answered "no," explaining, "I'm making a distinction . . . between mental disease, defect, or disorder from diminished actuality, which doesn't fall within these parameters." The court found the offer of proof concerning Kania to be "totally lacking in any substance relevant to the guilt phase proceedings." It cited section 29[18] as prohibiting Kania from testifying about "diminished actuality or intent, knowledge, malice aforethought, or anything of that sort," and stated that if Kania did not have an opinion concerning any mental diseases or defect on the part of defendant, then his testimony was irrelevant — "That is my intended ruling at this point in time." The defense thereafter called its first witness.

The issue was revisited at the end of the day when defense counsel was permitted to make an offer of proof and provide further argument. Counsel argued that testimony of "diminished actuality" was not prohibited under section 29, and further argued that under *People v. Saille* (1991) 54 Cal.3d 1103 (*Saille*), Kania could testify concerning whether defendant's condition, due to voluntary

---

[18]    Section 29 provides, in part: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged."

intoxication, affected defendant's ability to form the specific intent required for the charged offenses. The trial court agreed to review *Saille* and reconsider its ruling in this regard, but noted that evidence of defendant's voluntary intoxication already had been admitted and that the jury would be instructed pursuant to section 22, subdivision (a), concerning voluntary intoxication as it related to specific intent and issues of mental state. The court further explained: "Voluntary intoxication is one thing, mental disease or defect is another. Normally, what I would expect from a forensic alienist is for that person to testify, for example, . . . defendant Smith was examined on such and such a day . . . and upon my examination I determined that he suffered from the following mental disease or defect, paranoid schizophrenia[,] and I have an opinion as to whether or not he was suffering from that disease on June 19th, 1996. My opinion is that, yes, he was suffering from that disease on that day, in my opinion. And the effect of that disease on a person and his ability to think is X, Y, and Z. [¶] That's the extent to which the expert witness under [section 28**19**] is allowed to testify. But Penal Code Section 29 says they can't go that leap further and say I have an opinion that on the . . . 19th of June, 1996, based on the mental disease or defect, paranoid schizophrenia or voluntary intoxication, the defendant did not actually form the specific intent to burgle or rape or sodomize or premeditate . . . — he could not have premeditated and deliberated at that point in time."

---

**19**     Section 28, subdivision (a) provides: "Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged."

When court reconvened two days later, defense counsel advised that there still was no report from Kania. The court reiterated its position that Kania's proposed testimony was irrelevant to the guilt phase, and cautioned against further delay, stating, "there is no justification that I am currently aware of why a report has not been prepared." Several days later, counsel finally provided Kania's report, and the prosecutor promptly filed a motion in limine to exclude Kania's testimony. Before the scheduled hearing on that motion could take place, however, the defense rested without calling Kania as a witness. In light of these developments, the prosecution moved to strike the evidence that had been admitted concerning defendant's hospitalization as a teenager. The trial court agreed that this evidence, which had been admitted in anticipation of Kania's testimony, was no longer relevant. At the request of defense counsel, the court deferred final consideration of the motion to strike until the following day.

The next morning, defense counsel requested to reopen the case so that he could call Kania to testify on the issue of "diminished actuality," arguing it was related to evidence that had been admitted concerning defendant's voluntary intoxication on the evening of Eddings's murder: "Voluntary intoxication is recognized as one of those items that can create the issue or the state of diminished actuality." The trial court, noting its decision to admit evidence regarding defendant's use of alcohol and Eddings's attitudes toward alcohol consumption, agreed that the issue of voluntary intoxication was "still before the jury, may be argued to the jury, and the jury under the instructions requested by both counsel will be instructed on that area insofar as it relates to voluntary intoxication."[20] It

---

[20] The jury later was instructed pursuant to CALJIC No. 4.21.1: "Under the law it is the general rule that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of being in such condition. . . .

*(footnote continued on next page)*

quoted from Kania's recently produced report as offering the following conclusions: "[Defendant] suffers from a severe personality disorder and a significant drinking problem that results in a sudden change in his personality. This change is primarily the result of a weakening of his already weak controls. He lacks adequate psychological resources to deal with stressful situations, and alcohol only serves to weaken these taxed resources. Underlying this control is considerable anger and a dependency on other people. He has a feeling that his affectional needs have never been met, a profound sense of loneliness, and very low appraisal of himself and his abilities." The court then reiterated its opinion that insofar as Kania did not offer a differential diagnosis of a mental disease or disorder that might be found in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.) of the American Psychiatric Association and which was

---

*(footnote continued from previous page)*

However, there is an exception to this general rule, namely, where a specific intent is an essential element of a crime or special circumstance allegation. In such event, you should consider the defendant's voluntary intoxication in your determination of whether the defendant possessed the required specific intent at the time of the commission of the alleged crime. [¶] Thus in the crime of first-degree murder and the three alleged special circumstances, a necessary element is the existence in the mind of the defendant of a certain specific intent which is included in the definition of the crime and the special circumstances set forth elsewhere in these instructions. [¶] If the evidence shows that a defendant was intoxicated at the time of the alleged crime, you should consider that fact in determining whether or not the defendant had the required specific intent. [¶] If from all of the evidence you have a reasonable doubt whether the defendant had such specific intent, you must find that the defendant did not have such specific intent. [¶] Intoxication of a person is voluntary if it results from the willing use of any intoxicating liquor, drug, or other substance knowing that it is capable of an intoxicating effect or when he willingly assumes the risk of that effect. [¶] Voluntary intoxication includes the voluntary ingestion, injecting or taking by any other means of any intoxicating liquor, drug, or other substance."

operating on defendant at the time of Eddings's death, his testimony was irrelevant at the guilt phase of the proceedings. The trial court therefore denied defense counsel's motion to reopen and call Kania. It also struck the evidence pertaining to defendant's hospitalization, which had been admitted in anticipation of Kania's testimony. As described at the outset of this opinion, Kania was permitted to testify during the penalty phase.

### (b) Analysis

As noted, defense counsel sought to introduce Kania's testimony only *after* the defense had rested its case. The decision to reopen a criminal matter to permit the introduction of additional evidence is a matter left to the broad discretion of the trial court. (*People v. Monterroso* (2004) 34 Cal.4th 743, 779 (*Monterroso*); *People v. Marshall* (1996) 13 Cal.4th 799, 836 (*Marshall*); see also §§ 1093, 1094.) In this case, we find no abuse of discretion in the trial court's denial of the motion to reopen defendant's case. The court had agreed to reconsider its prior ruling excluding Kania's testimony, and there was a prosecution in limine motion pertaining to Kania's testimony pending when the defense chose to rest its guilt phase case without obtaining a ruling. There is nothing otherwise excusing the defense's failure to call Kania before resting. This is not a case where the defense, through no fault of its own, discovered highly relevant new evidence late in the proceedings. To the contrary, defense counsel consulted with Kania "early on" in the representation, communicated with him throughout the trial, and had received Kania's report before its last witness testified, yet defense counsel did not attempt to call Kania as a witness until the prosecution moved to strike evidence of the defendant's hospitalization, after the defense rested. There is no abuse of discretion in refusing to reopen where "the evidence the defense sought to offer at reopening was indisputably available *during* the trial." (*Monterroso, supra,* 34 Cal.4th at p. 779 ["The trial court was entitled to rely on defendant's lack of

diligence in denying the motion to reopen."]; see also *People v. Funes* (1994) 23 Cal.App.4th 1506, 1521 [no abuse of discretion in denying motion to reopen where defense had pretrial access to all of the medical reports that indicated that the overlooked evidence might be relevant].) Nor did the trial court abuse its discretion in striking evidence of defendant's hospitalization, where such evidence had been admitted in anticipation of Kania's testimony, which never materialized.

Even assuming error in the exclusion of Kania's testimony at the guilt phase of trial, we would conclude such error was not prejudicial. (See, e.g., *People v. Breaux* (1991) 1 Cal.4th 281, 303.) The jury was instructed that it could consider defendant's voluntary intoxication in deciding whether he actually formed the required specific intent at the time of the commission of the alleged crimes. It nonetheless reasonably rejected defendant's version of the events in light of the substantial evidence from which jurors could infer that defendant acted based on a preconceived intent to sexually assault Eddings. This evidence included defendant's recorded statements to the police, his own admissions at trial, the autopsy findings, and defendant's history of violent sexual assaults. Furthermore, Kania's proposed guilt phase testimony was not inconsistent with this conclusion. For example, that defendant tended to act in anger or on impulse without reflecting upon the possible consequences, particularly when intoxicated, is consistent with defendant's having formed the requisite mental state for first degree felony-murder burglary and the related special circumstance — namely, intent to commit a felony, in this case rape or sodomy (see § 459) — when he argued with Eddings at her front door or when he forced his way inside Eddings's home. (See *People v. Markus* (1978) 82 Cal.App.3d 477, 481 ["It is the intent which exists in the mind of the perpetrator at the moment of entry which defines burglary."].) To the extent Kania's testimony was relevant to the "main line of defense" — that defendant did not go to Eddings's residence intending to harm her

but rather that he killed Eddings in an intoxicated state in the face of what he perceived was an attack and afterward sexually assaulted her dead body as an "expression of rage" — any "insight" into defendant's thought processes Kania might have provided would not have substantially added to or altered the picture of alcohol-fueled anger that was painted by defendant's own testimony, his earlier statements to law enforcement officers, the testimony of Dr. Silverman, the defense's medical expert in anatomic and clinical pathology, and defense counsel's arguments. Finally, we note that Kania did testify at the penalty phase and yet not one juror was swayed to vote for life imprisonment, suggesting the jury did not find the witness's testimony persuasive.

Nor was defendant prejudiced by the trial court's striking evidence of his mental health commitments as a youth. In light of the circumstance that the two occasions were mentioned only briefly by witnesses, occurred when defendant was a teenager, and lasted for short periods, they would have shed little light on defendant's intentions on the night of Eddings's death.

It therefore is not reasonably probable that defendant would have obtained a more favorable result had Kania testified during the guilt phase. (See *People v. McNeal* (2009) 46 Cal.4th 1183, 1203 ["Because the trial court merely rejected some evidence concerning a defense, and did not preclude defendant from presenting a defense, any error is one of state law and is properly reviewed under *People v. Watson, supra,* 46 Cal.2d at page 836."].) For the same reasons, with regard to defendant's federal constitutional claims, we conclude that even if there was error, it was harmless beyond a reasonable doubt. (*Chapman, supra,* 386 U.S. at p. 24.)

### C. Penalty Phase Issues

#### 1. *Victim impact evidence*

Defendant claims the trial court erred in admitting victim impact evidence under section 190.3, factor (a) (circumstances of the crime) and factor (b) (other violent criminal activity), arguing that admission of this evidence violated Evidence Code section 352, as well as his Fifth, Fourteenth and Eighth Amendment rights to reliable sentencing under the United States Constitution. At issue are the admission, over defense objection, of 32 photographs of Eddings with various family members; testimony from Eddings's daughter, two nieces, and a grandniece describing Eddings's unique characteristics and the impact of her loss on their family; and testimony concerning the impact of defendant's 1972 attack on Norma Knight. We conclude the trial court did not err in admitting any of this victim impact evidence.

*(a) Photographs of victim with family members and victim impact testimony admitted under section 190.3, factor (a)*

Factor (a) of section 190.3 provides for consideration of "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding." Victim impact evidence is relevant and admissible as a circumstance of the crime "so long as it is not 'so unduly prejudicial' that it renders the trial 'fundamentally unfair.' [Citations.]" (*People v. Russell* (2010) 50 Cal.4th 1228, 1264; see also *Lewis and Oliver, supra,* 39 Cal.4th at pp. 1056-1057 ["Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is . . . admissible . . . under section 190.3, factor (a)"].) "Admission of testimony presented by a few close friends or relatives of each victim, as well as images of the victim while he or she was alive, has repeatedly been held constitutionally permissible." (*Russell, supra,* at p. 1265.)

At trial, the prosecution sought to introduce various forms of victim impact evidence, including a seven-minute videotape photo montage consisting of 42 separate photographs, set to music, of Eddings with various family members taken at birthday parties and other gatherings, and testimony from family members concerning Eddings's life and the impact of her loss on their lives. Prior to the beginning of the penalty phase, defendant moved to limit the use of such evidence.

With regard to the proposed victim impact testimony concerning Eddings, the trial court ruled that "individuals who are familiar with the victim . . . can come and testify about the impact that her loss had on them and members of the family with whom they are familiar, within certain limits." The court described these limits as follows: "the opinions of family members about the crime, about the defendant, or the appropriate punishment have little or no relevance and should be excluded. I think this should be extended also to the witness's exposure to facts of the crime during the trial or to the impact that the trial proceedings have had on the family members themselves." Pursuant to this ruling and as summarized at the outset of this opinion, the prosecution called four family members to testify: Eddings's daughter, Helen Harrington, two of Eddings's nieces, Donna Velasquez and Ernestine Pierson, and her grandniece, Shirley Grimmett.

The trial court sustained defense objections, however, and granted defendant's motion to limit the use of the videotape, holding that although each individual photograph may be relevant and admissible, their combination as a montage set to music pushed the document "over the line from evidence into argument," and noting that "the Court must guard against . . . a situation where the effect is so overwhelming that the jurors are unable to follow the instructions of the Court, where they are unable to set and put in perspective their emotional response and the emotional response of the family in light of the other evidence that is presented." This ruling did not, however, preclude the prosecution from

introducing the individual photographs through the testimony of one or more live witnesses. The prosecution thereafter introduced 34 of the photographs through the testimony of Eddings's relatives. Harrington authenticated a majority of the photographs, describing them in brief, matter-of-fact terms. Additional photographs were introduced through the testimony of Velasquez and Grimmett. Defendant objected to the receipt of the photographs into evidence. The court excluded two of the photographs, one of a child who was distantly related to Eddings and one of Eddings's headstone. Thus, 32 photographs of Eddings with her family ultimately were introduced into evidence.

As a preliminary matter, defendant claims that this court's construction of section 190.3, factor (a), as allowing evidence about a victim's life that was not known or reasonably foreseeable to the defendant at the time of the murder, has rendered the statute unconstitutionally vague. We consistently have rejected this argument (e.g., *People v. Carrington* (2009) 47 Cal.4th 145, 196-197 (*Carrington*); *Lewis and Oliver, supra,* 39 Cal.4th at p. 1057; *Roldan, supra,* 35 Cal.4th at p. 732; *People v. Pollock* (2004) 32 Cal.4th 1153, 1183), and do so again. As the United States Supreme Court held in *Payne v. Tennessee* (1991) 501 U.S. 808, "a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. '[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.' [Citation.]" (*Id.* at p. 825.) Moreover, the nature of murder is such that the tragic consequences should always be foreseeable to the defendant: "The fact that the defendant may not know the details of a victim's life and characteristics, or the

exact identities and needs of those who may survive, should not in any way obscure the further facts that death is always to a 'unique' individual, and harm to some group of survivors is a consequence of a successful homicidal act so foreseeable as to be virtually inevitable." (*Id.* at p. 838 [conc. opn. of Souter, J.].) California law is consistent with these principles. (*Lewis and Oliver, supra,* at pp. 1056-1057.)

We have reviewed the victim impact evidence admitted under section 190.3, factor (a), and conclude that the evidence was not so inflammatory as " 'to divert[] the jury's attention from its proper role or invite[] an irrational, purely subjective response . . . .' [Citation.]" (*People v. Edwards* (1991) 54 Cal.3d 787, 836.) The testimony from Eddings's daughter, her two nieces, and a grandniece, all of whom were very close to Eddings, "concerned the kinds of loss that loved ones commonly express in capital cases." (*Lewis and Oliver, supra,* 39 Cal.4th at p. 1057.) In addition to recounting basic facts about Eddings, such as that she was a loving and attentive mother, grandmother and aunt, liked to garden, cook and bake, and was very generous with her time and money, the witnesses spoke of their love of Eddings, special moments they shared with her, their feelings upon learning of her death and seeing her burned home, and how the manner in which she died affected them and various family members. These recollections of past incidents or activities that family members shared with Eddings, and of the immediate and lasting impact of her murder, all fell well within the ambit of permissible victim impact evidence. (E.g., *People v. Brown* (2004) 33 Cal.4th 382, 397-398 (*Brown*) [upholding admission of victim impact testimony that "concerned either the immediate effects of the murder," the "residual and lasting impact" that the victim's family continued to experience, and testimony that served "to explain why [the family members] continued to be affected by his loss and to show the 'victim's "uniqueness as an individual human being" ' "].)

87

In arguing that the victim impact evidence was excessively emotional and prejudicial, defendant specifically references portions of Harrington's testimony when she spoke of her unconscious habit of calling her mother on the phone for the first year following Eddings's murder, and to the testimony of Grimmett, Eddings's grandniece, that her daughter and son-in-law had marital problems for a month after the murder because they "thought of all the torment and everything that [Eddings] had gone through, just in that simple act." "This testimony was not dissimilar from, or significantly more emotion-laden than, other victim impact testimony that has been held admissible." (*People v. Jurado* (2006) 38 Cal.4th 72, 133 [the victim's father testified that he suppressed his emotions concerning her death and as a result, his " 'drinking got out of hand,' " and he " 'had to finally go to a treatment center' " to address that problem]; see also *People v. Wilson* (2005) 36 Cal.4th 309, 356 [the victim's sister testified concerning her daughter's attempted suicide, other difficulties her family faced after the victim's daughters moved in with them, and the victim's young daughter's fear that defendant would " 'do something to them' "]; *Brown, supra,* 33 Cal.4th at p. 398 [the victim's brother described his custom of saluting the victim's grave every time he drove past the cemetery, and the victim's father testified that he had not gone fishing since his son's death].) Rejecting defendant's challenge to the admission of this evidence is consistent with our prior decisions. The challenged testimony simply reflects "manifestations of the psychological impact experienced by the victims" and "understandable human reactions" to the nature and circumstances of Eddings's murder. (*Brown, supra,* at p. 398.)

The witnesses also were asked to identify several photographs of Eddings with various family members taken at different gatherings at different times throughout her life, and to describe the subjects and the settings. "Although emotion must not 'reign over reason' at the penalty phase [citations], photographs

of the victims of the charged offenses are generally admissible." (*People v. Carpenter* (1997) 15 Cal.4th 312, 400-401.) Here, the photographs of ordinary family events were factual, relevant, and not unduly emotional or sentimental. They served simply to "humanize[]" the victim, "as victim impact evidence is designed to do." (*People v. Kelly* (2007) 42 Cal.4th 763, 797.) As such, the photographs were within the court's discretion to admit into evidence. The trial court moreover carefully exercised that discretion. Although it admitted the majority of the photographs, it excluded two as irrelevant, and it also excluded the video montage as "over the line" and argumentative. (See *People v. Prince* (2007) 40 Cal.4th 1179, 1289 ["Courts must exercise great caution in permitting . . . victim-impact evidence in the form of a lengthy videotaped or filmed tribute to the victim," because it "may assist in creating an emotional impact upon the jury that goes beyond what the jury might experience by viewing still photographs of the victim or listening to the victim's bereaved parents."].)

Finally, we note that the victim impact evidence at issue here was not particularly voluminous. The testimony of Eddings's family constituted only a total of 58 pages of the roughly 700 pages of transcript from the penalty phase, as the bulk of the prosecution's evidence in aggravation related to defendant's numerous prior violent acts against other women. By comparison, defendant's mitigating evidence constituted approximately 300 pages. Moreover, it was the brutality of Eddings's murder, and not victim impact, that the prosecutor emphasized to the jury in arguing why the death penalty was appropriate for defendant and a life sentence was not. The prosecutor's references to the impact of the crime on the lives of Eddings's family members were brief — for example, the prosecutor argued that jurors could "consider the effects on the lives of these women who have survived Billy Jones and the effects on the family members of

89

Ruth Eddings who have to live with what he did to Ruth Eddings" — and were not statements designed to evoke an irrational emotional response.

*a) Testimony of impact of prior crime on stabbing victim admitted under section 190.3, factor (b)*

Factor (b) of section 190.3 provides for consideration of "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." With regard to the prosecution's proposed victim impact evidence concerning the 1972 stabbing of Norma Knight, the trial court ruled such evidence was admissible under section 190.3, factor (b), citing *People v. Mickle* (1991) 54 Cal.3d 140, 186-187 (*Mickle*), and *People v. Garceau* (1993) 6 Cal.4th 140, 200-202 (*Garceau*). Pursuant to this ruling and as described above, the prosecution introduced evidence of the lasting effect of the assault upon Knight.

Defendant contends that the trial court erred in determining that section 190.3, factor (b), allowed for victim impact evidence related to other violent criminal activity, and in its reliance on *Mickle, supra,* 54 Cal.3d at pages 186-187, and *Garceau, supra,* 6 Cal.4th at pages 200-202. We disagree. In *Mickle*, we expressly held that "[t]he foreseeable effects of defendant's prior violent sexual assaults upon the victims — ongoing pain, depression, and fear — were . . . admissible as circumstances of the prior crimes bearing on defendant's culpability." (*Mickle, supra,* at p. 187.) In *Garceau,* we upheld the trial court's admission of a prior violent crime victim's testimony, rejecting the claim that her testimony constituted impermissible victim impact evidence. (*Garceau, supra,* at pp. 201-202.)

Even assuming, as defendant argues, that other state courts have excluded prior-crimes-victim-impact evidence as irrelevant and inappropriate, we repeatedly have rejected this argument, and defendant presents no compelling reason to

reconsider those decisions. (E.g., *People v. Demetrulias* (2006) 39 Cal.4th 1, 39 (*Demetrulias*) ["the circumstances of the uncharged violent criminal conduct, including its direct impact on the victim or victims of that conduct, are admissible under factor (b)"]; *People v. Holloway* (2004) 33 Cal.4th 96, 143 (*Holloway*) [same]; *People v. Mendoza* (2000) 24 Cal.4th 130, 185-186 [same].)

Defendant does not identify any specific aspect of the testimony concerning the impact of defendant's stabbing on Knight that he contends was unduly prejudicial, arguing only generally that this type of evidence is inadmissible. We conclude that the testimony regarding Knight's mental state following the stabbing — which consumed fewer than three pages and indicated simply that Knight was unable to continue working as a teacher after the stabbing and remained under psychiatric treatment some 25 years later — was not the type of evidence that would evoke an irrational emotional response from the jury, but rather fell well within the ambit of permissible victim impact evidence. (See, e.g., *Holloway, supra,* 33 Cal.4th 96, 143 [upholding § 190.3, factor (b), testimony concerning emotional trauma that resulted from a violent assault by the defendant that occurred several years before the charged murders].)

### 2. *Refusal to instruct the jury pursuant to defendant's proposed special instructions*

The jury was instructed pursuant to standard CALJIC penalty phase instructions that we repeatedly have held constitute correct statements of the law. Defendant nevertheless claims his death sentence must be reversed because the trial court rejected a number of "more detailed," "comprehensive," and "carefully tailored" special instructions he proposed. He argues that the refusal to give these instructions was erroneous and violated several rights guaranteed by the federal and state Constitutions — his right to present a defense, to a fair and reliable capital trial, to a trial by a properly instructed jury, and to due process — and that

91

he suffered prejudice as a result.  As discussed further below, we conclude each of defendant's claims of instructional deficiency is without merit.

*(a) Refusal to instruct the jury concerning its "normative and moral" function during the penalty phase*

Defendant argues that it was error for the trial court to give the CALJIC penalty phase instructions, which he contends emphasized the jury's factfinding duties by, for example, instructing jurors to "determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise" (CALJIC No. 8.84.1), without also "reminding" jurors of the normative and moral nature of their task.  Defendant's special instruction No. 1 would have provided, in relevant part, as follows:  "Your duty in this phase of the case is different from your duty in the first part of the trial, where you were required to determine the facts and apply the law.  Your responsibility in the penalty phase is not merely to find facts, but also — and most important — to render an individualized determination about the penalty appropriate for the particular defendant — that is, whether he should live or die."  Defendant contends this instruction was necessary for the jury to competently perform its function at the penalty phase, and that without it, the jury may have been misled into believing that its only or primary role was to find facts, leading it to misunderstand and neglect its roles as the voice and conscience of the community.  To the contrary, the trial court properly rejected special instruction No. 1 because it was duplicative of other instructions given to the jury.  (*People v. Ramirez* (2006) 39 Cal.4th 398, 470 (*Ramirez*).)

This court has held repeatedly that the CALJIC penalty phase instructions " ' "are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards."  [Citation.]' " (*People*

92

*v. Brown* (2003) 31 Cal.4th 518, 569.)[21]  To the extent defendant claims that special instruction No. 1 would have informed the jurors that "they were free to vote for life based solely on mercy," it was duplicative of CALJIC No. 8.85, which incorporates section 190.3, factor (k), and instructed the jury "to consider, take into account, and be guided by . . . any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death."  "[W]e have held that ' "a jury told it may sympathetically consider all mitigating evidence need not also be expressly instructed it may exercise mercy." [Citations.]' [Citation.]  Because defendant's jury had been instructed in the language of section 190.3, factor (k), we must assume the jury already understood it could consider mercy and compassion . . . ." (*People v. Brown, supra,* 31 Cal.4th at p. 570; see also *People v. Brasure* (2008) 42 Cal.4th 1037, 1069-1070 (*Brasure*) [same].)  No additional instruction was required.

---

[21]  For example, CALJIC No. 8.84, given at the beginning of the penalty phase and at the conclusion of the evidence, instructed the jury concerning its specific sentencing responsibility — "to determine which . . . penalty, life imprisonment without the possibility of parole or death, shall be imposed."  CALJIC No. 8.88 repeated this instruction, and added that the jury was "to consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances," and that jurors were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider."  CALJIC No. 8.84.1 instructed jurors neither to be influenced by bias or prejudice against the defendant, nor swayed by public opinion or public feeling, and further to consider all of the evidence, follow the law, and exercise their discretion conscientiously, in order to reach a "just verdict."  Additionally, the trial court gave special instructions Nos. 24 and 41, which directed each juror to "make his or her own individual assessment of the weight to be given" to mitigating evidence, because "the People and the defendant are entitled to the individual opinion of each juror."

Even if the language of special instruction No. 1 was taken from *People v. Brown* (1988) 46 Cal.3d 432, this would not assist defendant's argument. (*Id.* at p. 448 ["A capital penalty jury . . . is charged with a responsibility different in kind from such guilt phase decisions:  its role is not merely to find facts, but also — and most important — to render an individualized, *normative* determination about the penalty appropriate for the particular defendant — i.e., whether he should live or die."].)  In that case, the court had occasion to address not jury instructions but the harmless error standard applicable to errors at the penalty phase of a capital case, concluding that the "reasonable-possibility" test, rather than the less exacting "reasonable-probability" test, applied.  (*Ibid.* ["When the 'result' under review is such a normative conclusion based on guided, individualized discretion, the [reasonable-probability] standard of review is simply insufficient to ensure 'reliability in the determination that death is the appropriate punishment in a specific case.'  [Citations.]"].)

> *(b)Refusal to instruct the jury not to rely solely on the facts supporting the murder verdict or special circumstance finding as aggravating factors, and not to consider the same aggravating factor more than once*

Defendant's special instructions Nos. 7 and 8 would have prohibited the jury from considering as aggravating evidence the facts supporting the murder conviction and the special circumstance findings, unless those facts established "something in addition" to the elements of the crime or the special circumstance.[22]

---

[22]     Special instructions Nos. 7 and 8 would have provided as follows:  "You may not treat the verdict and finding of first degree murder committed under [a] special circumstance, in and of themselves, as constituting an aggravating factor.  For, under the law, first degree murder committed with a special circumstance may be punished by either death or life imprisonment without the possibility of parole.  [¶]  Thus, the verdict and finding which qualifies a particular crime for either of these punishments may not be taken, in and of themselves, as justifying one penalty over the other.  You may, however, examine the evidence presented in

*(footnote continued on next page)*

Defendant claims that without these special instructions, the penalty phase instructions failed to adequately guide the jury's discretion because there was no instruction that precluded jurors from "double counting" the guilt phase facts and imposing a sentence of death based solely on the circumstances underlying defendant's capital murder conviction.

We rejected an analogous claim in *People v. Earp* (1999) 20 Cal.4th 826, 900-901 (*Earp*), and more recently in *People v. Moon* (2005) 37 Cal.4th 1, 40 (*Moon*). In both instances, we reiterated that section 190.3, factor (a) — which expressly permits the penalty jury to consider, as a factor in either aggravation or mitigation, "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true" — does not require a "clarifying gloss" instructing the jury that its penalty phase determination must not be based on facts that are "common to all homicides." (*Earp, supra,* 20 Cal.4th at p. 900; see *Moon, supra,* 37 Cal.4th at p. 40.) We further noted that there is no constitutional mandate that the penalty phase jury, when considering the factors in aggravation of a capital crime, must "factor out" those constituent parts common to all first degree murders or establishing the special circumstances. To the contrary, " ' "in order to perform its moral evaluation of whether death was the appropriate penalty, the facts of the

---

*(footnote continued from previous page)*

the guilt and penalty phases of this trial to determine how the underlying facts of the crime bear on aggravation or mitigation. [¶] In deciding whether you should sentence the defendant to life imprisonment without the possibility of parole, or to death, you cannot consider as an aggravating factor any fact which was used by you in finding him guilty of murder in the first degree unless that fact establishes something in addition to an element of the crime of murder in the first degree. The fact that you have found Mr. Jones guilty beyond a reasonable doubt of the crime of murder in the first degree is not itself an aggravating circumstance."

murder 'cannot comprehensively be withdrawn from the jury's consideration
. . . .' " ' " (*Earp, supra,* at pp. 900-901; see also *Moon, supra,* 37 Cal.4th at pp. 40-41.)

The trial court moreover instructed pursuant to CALJIC No. 8.88, which provided in relevant part that "[a]n aggravating factor is any fact, condition or event attending the commission of a crime *which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.*" (Italics added.) Special instructions Nos. 7 and 8 thus "would have been duplicative of this instruction." (*Earp*, *supra*, 20 Cal.4th at p. 901.)

In a related argument, defendant claims the trial court erred in refusing his special instruction No. 9, which would have advised the jury that it could not "double count" the facts underlying a special circumstance in the course of the penalty weighing process.[23] Although the trial court should have admonished the jury as requested, the failure to do so does not warrant reversal. As noted, the trial court instructed the jury concerning the consideration of aggravating and mitigating circumstances pursuant to CALJIC No. 8.85, which incorporates section 190.3, factor (a).[24] In *People v. Melton* (1988) 44 Cal.3d 713, this court

---

[23] Special instruction No. 9 would have provided as follows: "You must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the crimes for which the defendant has been convicted. In other words, do not consider the same factors more than once in determining the presence of aggravating factors."

[24] As is relevant here, the jury was instructed pursuant to CALJIC No. 8.85 as follows: "In determining which penalty is to be imposed on the defendant you shall consider all of the evidence which has been received during any part of the trial in this case. . . . In determining which penalty is to be imposed on the defendant, you shall consider and take into account and be guided by the following factors if applicable. Here there are a number of factors and they are lettered A

*(footnote continued on next page)*

recognized a "theoretical problem" (*id.* at p. 768) with the literal language of factor (a), in that it instructs the jury to consider both the " 'circumstances of the crime' " and " 'the existence of any special circumstances.' " (*Melton,* at p. 763.) "Since the latter are a subset of the former, a jury given no clarifying instructions might conceivably double-count any 'circumstances' which were also 'special circumstances.' On defendant's request, the trial court should admonish the jury not to do so." (*Id.* at p. 768.) In this context, however, " '[w]e have . . . recognized repeatedly that the absence of an instruction cautioning against double counting does not warrant reversal in the absence of any misleading argument by the prosecutor.' [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1225-1226.) Defendant does not suggest that the prosecutor in this case did anything to mislead the jury in this respect. Consequently, "there is no reasonable likelihood that the jury unconstitutionally applied CALJIC No. 8.85." (*Id.* at p. 1226.)

> (c)*Refusal to instruct the jury that it is required to return a verdict of life imprisonment without the possibility of parole if it determined that the mitigating factors outweigh the aggravating factors*

Defendant's special instruction No. 35 would have provided, in relevant part, as follows: "If you find that the existence of a mitigating circumstance alone outweighs any number of aggravating circumstances, you shall return a verdict of confinement in the state prison for life without the possibility of parole." The trial court rejected special instruction No. 35 on the ground that it was duplicative of CALJIC No. 8.88, which instructed the jury, in relevant part, as follows: "To return a judgment of death, each of you must be persuaded that the aggravating

---

*(footnote continued from previous page)*

through K: A, as a factor in either aggravation or mitigation, the circumstances of the crime of which the defendant has been convicted in the present proceedings and the existence of any special circumstance found to be true. . . ."

circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without the possibility of parole."

Defendant claims that CALJIC No. 8.88 is constitutionally deficient because it fails to instruct the jury that it is required to return a verdict of life without the possibility of parole if it determines that even a single mitigating factor, standing alone, outweighs any number of aggravating factors. He derives such a requirement from section 190.3, which states in part: "If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole." Defendant further contends that CALJIC No. 8.88's use of the phrase "so substantial" would permit imposition of the death penalty in cases in which the aggravating circumstances are merely "of substance" or "considerable," even if they are outweighed by mitigating circumstances. He argues that reasonable jurors might not understand that if the mitigating circumstances outweighed the aggravating circumstances, they were required to return a verdict of life without possibility of parole.

We repeatedly have rejected these arguments. (E.g., *Carrington, supra,* 47 Cal.4th at p. 199; *People v. Rogers* (2006) 39 Cal.4th 826, 900; *People v. Duncan* (1991) 53 Cal.3d 955, 978.) "Contrary to defendant's characterization of the instruction, CALJIC [No.] 8.88 highlights the significant burden that must be satisfied before a verdict of death may be returned, and thereby conveys that life in prison without the possibility of parole is the appropriate punishment if this burden is not met." (*People v. Page* (2008) 44 Cal.4th 1, 57; see also *People v. Stanley* (2006) 39 Cal.4th 913, 963 [rejecting claim that CALJIC No. 8.88 is " 'death oriented' " for failing to convey that one mitigating factor, standing alone, may be sufficient to outweigh all other aggravating factors]; *People v. Ray* (1996) 13 Cal.4th 313, 356 [by limiting the circumstances in which death can be imposed,

CALJIC No. 8.88 "clearly implies that a sentence less than death *may* be imposed in all other circumstances"].) "We do not think that there is a reasonable likelihood that any of the jurors would have concluded that, even if the mitigating factors outweighed those in aggravation, the 'so substantial in comparison with' language nevertheless might demand imposition of the higher punishment." (*Duncan, supra,* at p. 978; see also *People v. Cook* (2007) 40 Cal.4th 1334, 1367-1368 (*Cook*) [the term "substantial" in this context provides adequate guidance to the jurors]; *People v. Smith* (2005) 35 Cal.4th 334, 370 [CALJIC No. 8.88 "permits a death penalty only if aggravation is so substantial in comparison with mitigation that death is warranted; if aggravation failed even to outweigh mitigation, it could not reach this level"]; *People v. Boyette* (2002) 29 Cal.4th 381, 465 [the phase "so substantial" in this context is not unconstitutionally vague]; *Bolin, supra,* 18 Cal.4th at p. 343 ["[T]he 'so substantial' instruction 'clearly admonishes the jury to determine whether the balance of aggravation and mitigation makes death the appropriate penalty.' "].) Defendant does not persuade us to reconsider our view that CALJIC No. 8.88 is constitutionally sufficient.

*(d) Refusal to instruct the jury that one mitigating factor is sufficient to support a decision that a sentence of death is unwarranted*

Defendant's special instructions Nos. 11, 18, 34 and 35 would have informed the jurors that one mitigating factor, standing alone, may be sufficient to support a sentence of life without the possibility of parole.[25] Defendant argues

---

[25] Like special instruction No. 35, discussed *ante*, special instruction No. 11 would have provided, in relevant part, that "[a]ny one mitigating factor, standing alone, may support a decision that death is not the appropriate punishment in this case." Special instruction No. 18 would have provided as follows: "Since you, as jurors, decide what weight is to be given the evidence in aggravation and the evidence in mitigation, you are instructed that any mitigating evidence standing alone may be the basis for deciding that life without the possibility of parole is the

*(footnote continued on next page)*

that without these special instructions, the standard instructions did not adequately inform the jurors of the nature and scope of their determination, and risked the jurors' misapprehending their role.

We previously have rejected the claim that a trial court is required to instruct the jury that one mitigating factor could outweigh multiple aggravating factors, explaining that "the standard jury instructions . . . 'are adequate to inform the jurors of their sentencing responsibilities in compliance with federal and state constitutional standards.' [Citations.]" (*People v. Kelly, supra,* 42 Cal.4th at p. 799; see also *Lewis, supra,* 46 Cal.4th at p. 1316 [same].) As in our prior cases, the other standard instructions that were given — including CALJIC No. 8.88, which instructed the jury that a mitigating factor may be "any fact, condition, or event" and that jurors could assign to each factor any moral or sympathetic value they deem appropriate — "amply covered the point." (*Cook, supra,* 40 Cal.4th at p. 1364.) Moreover, a "trial court may properly refuse as argumentative an instruction that one mitigating factor may be sufficient for the jury to return a verdict of life imprisonment without possibility of parole." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1150.)

*People v. Sanders* (1995) 11 Cal.4th 475, does not assist defendant's argument. In *Sanders*, we expressed approval of an instruction advising the jury, in part, that one mitigating factor may be sufficient to determine that life without the possibility of parole is the appropriate punishment, finding that the instruction, as a whole, reduced the risk that the jury would misapprehend "the nature of the

---

*(footnote continued from previous page)*

appropriate punishment." Finally, special instruction No. 34 would have provided, in relevant part, that "[o]ne mitigating circumstance may be sufficient to support the decision that death is not appropriate punishment in this case."

100

penalty determination process or the scope of their discretion to determine through the weighing process whether death or life imprisonment without possibility of parole was the appropriate punishment." (*Id.* at p. 557.)  We neither imposed nor contemplated, however, an *obligation* to instruct the jury that a single mitigating factor could outweigh all other aggravating factors.  To the contrary and as noted above, we have repeatedly held that the standard jury instructions, specifically CALJIC No. 8.88, adequately instruct the penalty phase jurors as to the nature and scope of their determination.  (See also *People v. Smith* (2005) 35 Cal.4th 334, 371; *People v. Taylor* (2001) 26 Cal.4th 1155, 1181.)  We decline to revisit these decisions.

> *(e) Refusal to instruct the jury that death is the most severe penalty the law can impose*

Defendant's special instruction No. 3A would have advised the jury that death is the most severe penalty the law can impose.[26]  Defendant claims that Special Instruction No. 3A was necessary because during voir dire, several *prospective* jurors expressed the opinion that a sentence of life without the possibility of parole constituted a punishment more severe than a death sentence. We repeatedly have held that "there is no legal requirement that penalty phase jurors be instructed that death is the greater punishment, because the penalty trial

---

[26]    Special instruction No. 3A would have provided as follows:  "Some of you expressed the view during jury selection that the punishment of life in prison without the possibility of parole was actually worse than the death penalty.  [¶] You are instructed that death is qualitatively different from all other punishments and is the ultimate penalty in the sense of the most severe penalty the law can impose.  Society's next most serious punishment is life in prison without that possibility of parole.  [¶]  It would be a violation of your duty, as jurors, if you were to fix the penalty at death with a view that you were thereby imposing the less severe of the two available penalties."

itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty. [Citations.]" (*People v. Cowan* (2010) 50 Cal.4th 401, 501.) As noted, the jury was instructed that before a judgment of death can be returned, each juror "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole." (CALJIC No. 8.88.) The instruction makes clear that "death is considered to be a more severe punishment than life is explicit in California law . . . ." (*People v. Harris* (2005) 37 Cal.4th 310, 361.)

*People v. Hernandez* (1988) 47 Cal.3d 315 and *People v. Murtishaw* (1989) 48 Cal.3d 1001 do not assist defendant's argument. In *Hernandez*, we noted that "[o]bviously death is qualitatively different from all other punishments and is the 'ultimate penalty' in the sense of the most severe penalty the law can impose." (*Hernandez, supra,* at p. 362.) In *Murtishaw*, we stated that to impose a death sentence, each juror . . . must believe aggravation is so relatively great, and mitigation so comparatively minor, that the defendant deserves death rather than society's next most serious punishment, life in prison without parole." (*Murtishaw, supra,* at p. 1027.) These statements neither imposed nor contemplated an obligation to instruct a capital jury concerning the relative severity of the death penalty, and we decline to revisit our holdings to the contrary.

*(f) Refusal to instruct the jury concerning the scope of mitigating evidence*

Defendant contends the trial court erred by rejecting his special instructions Nos. 10, 11, 13 through 17, and 23, regarding the scope of mitigating evidence. Defendant argues that the proposed special instructions "pinpointed" the crux of his defense, and the trial court therefore was required to give these pinpoint instructions upon request. (See, e.g., *Saille, supra,* 54 Cal.3d at p. 1119.) We do not find any error in the refusal to give these instructions.

Special instruction No. 10 would have informed the jury that it must "weigh, consider, take into account and be guided by" a three-and-one-half page, single-spaced list of some 45 mitigating scenarios. Defendant's special instruction No. 11 pinpointed specific mitigating evidence consistent with the defense theory: "defendant's childhood experiences, including incidents of physical abuse; prior confinement in juvenile facilities or prison; the treatment or lack of treatment for identified problems concerning aggression or sexual misconduct, and the defendant's voluntary admissions to the police or expressions of remorse." These instructions were properly rejected for several reasons. "Although instructions pinpointing the *theory* of the defense might be appropriate, a defendant is not entitled to instructions that simply recite facts favorable to him." (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1159.) Special instruction No. 10 additionally encouraged the jury to speculate in areas for which no evidence was presented, such as "defendant's artistic potential," or whether defendant would "assist prison staff in reducing tension and conflict within the prison." It also improperly precluded the jury from considering defendant's age as an aggravating factor. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 77-79 (*Hawthorne*); see also *People v. Verdugo* (2010) 50 Cal.4th 263, 304.) Finally, some aspects of special instruction No. 10 were covered by other instructions given to the jury, and "[a] trial court is not required to give pinpoint instructions that merely duplicate other instructions." (*People v. Panah* (2005) 35 Cal.4th 395, 486.) CALJIC No. 8.85, factor (i), for example, instructed the jury to consider, if applicable, as a factor in aggravation *or* mitigation, the age of the defendant. (*Cook, supra,* 40 Cal.4th at p. 1364 [the standard penalty phase instructions, including CALJIC No. 8.85, factor (i), adequately conveyed the full range of mitigating evidence to be considered by the jury].)

Special instructions Nos. 11, 14, and 15, addressing the "unlimited" breadth of mitigating evidence,[27] were duplicative of other instructions given, particularly CALJIC Nos. 8.85(k) and 8.88. (E.g., *People v. Avila* (2009) 46 Cal.4th 680, 722; *People v. San Nicolas* (2004) 34 Cal.4th 614, 673.) CALJIC No. 8.88 defined a mitigating circumstance as "any fact, condition, or event which, as such, does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty." CALJIC No. 8.85 instructed on section 190.3, factor (k), identifying as a possible mitigating factor "any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as basis for a sentence less than death, whether or not related to the offense for which he is on trial." Although we have mentioned with approval an instruction stating that mitigating factors are unlimited, "we also have stated that the catchall section 190.3, factor (k) instruction 'allows the jury to consider a virtually unlimited range of mitigating circumstances.' [Citation.]" (*Smithey, supra,* 20 Cal.4th at p. 1007.)

---

[27] Special instruction No. 11 would have instructed the jury that the mitigating factors provided by the court were "merely examples" and should not limit the jurors' consideration of additional mitigating factors. Special instruction No. 14 would have provided that "[m]itigating factors are unlimited and anything mitigating should be considered and may be taken into account in deciding to impose a sentence of life without possibility of parole." Special instruction No. 15 would have instructed that "[a]ny aspect of the offense or of the defendant's character or background that you consider mitigating can be the basis for rejecting the death penalty even though it does not lessen legal culpability for the present crime."

Finally, special instructions Nos. 13, 16, 17, and 23, elaborating on the concepts of sympathy, compassion, and mercy,[28] also were duplicative of CALJIC Nos. 8.85 and 8.88. We previously have held that in instructing on section 190.3, factor (k), "CALJIC No 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy. [Citation.]" (*People v. Burney* (2009) 47 Cal.4th 203, 261.) Specifically, CALJIC No. 8.85 factor (k) directed the jury to "consider, take into account and be guided by . . . any sympathetic or other aspect of the defendant's character or record." In addition, CALJIC No. 8.88 instructed the jurors that a "mitigating circumstance is any fact, condition or event which . . . may be considered as an extenuating circumstance in determining the appropriateness of the death penalty" and that they were "free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider." Thus, to the extent special instructions Nos. 13, 16, 17, and 23 would have directed the jury to consider all evidence in mitigation from whatever source, or

---

[28] Special instruction No. 13 would instructed the jury that a mitigating circumstance is not an excuse for the commission of the offense, but rather is a fact "which, in fairness, sympathy, compassion, or mercy, may be considered in" reducing a defendant's culpability. Special instruction No. 16 would have instructed that mitigating factors are not "limited to those adduced from specific evidence offered at the sentencing hearing," and may include "other factors, such as a humane perception of the defendant developed during trial." Special instruction No. 17 provided as follows: "If a mitigating circumstance or an aspect of the defendant's background or his character called to the attention of the jury by the evidence or its observation of the defendant arouses mercy, sympathy, empathy, or compassion such as to persuade you that death is not the appropriate penalty, you may act in response thereto and impose a sentence of life without possibility of parole." Special instruction No. 23 further would have instructed that jurors properly could be influenced by a "sympathetic response" to mitigating evidence.

instructed that emotions such as mercy, sympathy, empathy, or compassion were legitimate mitigation factors for its consideration, they were duplicative of instructions that were given. (See, e.g., *Monterroso, supra,* 34 Cal.4th at p. 791; *People v. Leonard* (2007) 40 Cal.4th 1370, 1420; *Ramirez, supra,* 39 Cal.4th at p. 470; *People v. Hinton* (2006) 37 Cal.4th 839, 911-912.) To the extent special instruction No. 16 would have directed the jury to consider defendant's demeanor at trial, it was duplicative of the section 190.3, factor (k) instruction (CALJIC No. 8.85(k)), which, combined with the other instructions regarding mitigation, "was broad enough to encompass jurors' observations of defendant in the courtroom." (*Monterroso, supra,* at p. 792; see also *Leonard, supra,* at p. 1420 [there is no need for an instruction expressly telling the jury it may base sympathetic feelings on its observations of defendant in court].)

*(g) Refusal to instruct the jury concerning lingering doubt*

Defendant claims that the trial court erred in refusing his special instruction No. 27, which would have directed the jury that it could consider, as a mitigating factor, any lingering doubt it had concerning the question of defendant's guilt.[29] We consistently have rejected this claim. (E.g., *Lewis and Oliver, supra,* 39 Cal.4th at p. 1067; *People v. Lawley* (2002) 27 Cal.4th 102, 166; *People v. Staten* (2000) 24 Cal.4th 434, 464.) Although it is proper for the jury to consider lingering doubt, there is no requirement, under federal or state law, that the jury specifically be instructed that it may do so, even if such an instruction is requested

---

[29] Special instruction No. 27 would have provided as follows: "Although proof of guilt beyond a reasonable doubt has been found, you may demand a greater degree of certainty for imposition of the death penalty. The adjudication of guilt is not infallible, and any lingering doubts you entertain on the question of guilt may be considered by you in determining the appropriate penalty, including the possibility that at some time in the future, facts may come to light which have not been discovered."

by the defendant.  (*People v. Gray* (2005) 37 Cal.4th 168, 231-232; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219; *People v. Sanchez* (1995) 12 Cal.4th 1, 77; see also *Abdul-Kabir v. Quarterman* (2007) 550 U.S. 233, 250-251 ["we have never held that capital defendants have an Eighth Amendment right to present 'residual doubt' evidence at sentencing"].)  "Instructions to consider the circumstances of the crime (§ 190.3, factor (a)) and any other circumstance extenuating the gravity of the crime (*id.*, factor (k)), together with defense argument highlighting the question of lingering or residual doubt, suffice to properly put the question before the penalty jury.  [Citation.]"  (*Demetrulias*, *supra*, 39 Cal.4th at p. 42; see also *People v. Avila* (2006) 38 Cal.4th 491, 615; *People v. Brown, supra,* 31 Cal.4th at pp. 567-568; CALJIC No. 8.85.)

Defendant attempts to distinguish special instruction No. 27 from other lingering-doubt instructions previously rejected by this court, arguing that his proposed special instruction did not "invit[e] readjudication of matters resolved at the guilt phase" (*People v. Thompson* (1988) 45 Cal.3d 86, 135), and did not "erroneously prescribe[] that the jury evaluate this factor in a particular manner" (*People v. Cox* (1991) 53 Cal.3d 618, 678, fn. 20), but rather simply would have allowed the jury to consider lingering doubt.  Even assuming defendant's characterizations are accurate, we recently upheld the rejection of a proposed special instruction on lingering doubt nearly identical to special instruction No. 27, reaffirming that "[a]lthough a defendant may assert his or her possible innocence in mitigation, and the jury may consider lingering doubt in determining the appropriate penalty, there is no requirement that the court specifically instruct the jury to consider lingering doubt.  [Citations.]"  (*Lewis, supra,* 46 Cal.4th at p. 1314.)

### 3. Challenges to California's death penalty scheme

Defendant raises a number of challenges to the constitutionality of California's death penalty scheme, based upon the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. As he acknowledges, we previously have considered and consistently rejected these contentions in prior cases. Presented with no reason that compels reconsideration, we therefore adhere to those decisions as follows.

Section 190.2 is not impermissibly overbroad in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. Specifically, the various special circumstances are not so numerous as to fail to perform the constitutionally required narrowing function, and the special circumstances are not unduly expansive, either on their face or as interpreted by this court. (E.g., *Jenkins, supra,* 22 Cal.4th at p. 1050; see also *Brown v. Sanders* (2006) 546 U.S. 212, 221 [recognizing that the special circumstances listed in section 190.2 are designed to satisfy the narrowing requirement].) Nor did the 1978 death penalty law — enacted by the voters by way of initiative in November 1978 — have the intended or practical effect of making all murderers death eligible. (E.g., *People v. Gray, supra,* 37 Cal.4th at p. 237, fn. 23.)

Section 190.3, factor (a), does not, on its face or as interpreted and applied, permit the "arbitrary and capricious" or "wanton and freakish" imposition of a sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. (E.g., *Brasure, supra,* 42 Cal.4th at p. 1066; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 (*Tuilaepa*) ["The circumstances of the crime are a traditional subject for consideration by the sentencer, and an instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence."].) "Defendant's argument that a seemingly inconsistent range of circumstances can be culled from

death penalty decisions proves too much.  What this reflects is that each case is judged on its facts, each defendant on the particulars of his offense.  Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances." (*Brown, supra,* 33 Cal.4th at p. 401.)

Neither the federal nor the state Constitution requires that the penalty phase jury make *unanimous* findings concerning the particular aggravating circumstances, find all aggravating factors *beyond a reasonable doubt*, or find beyond a reasonable doubt that the aggravating factors *outweigh* the mitigating factors.  (E.g., *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255.)  The United States Supreme Court's more recent decisions interpreting the Sixth Amendment's jury trial guarantee (see *Cunningham v. California* (2007) 549 U.S. 270; *United States v. Booker* (2005) 543 U.S. 220; *Blakely v. Washington* (2004) 542 U.S. 296; *Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not alter these conclusions.  (E.g., *People v. Bramit* (2009) 46 Cal.4th 1221, 1249, 1250, fn. 22.)

"The death penalty scheme is not unconstitutional because it fails to allocate the burden of proof — or establish a standard of proof — for finding the existence of an aggravating factor . . . .  [Citations.]" (*People v. Friend* (2009) 47 Cal.4th 1, 89 (*Friend*).)  "Unlike the guilt determination, 'the sentencing function is inherently moral and normative, not factual' [citation] and, hence, not susceptible to a burden-of-proof quantification." (*Hawthorne, supra,* 4 Cal.4th at p. 79.)  We additionally reject defendant's alternative argument that even if it is permissible not to impose any burden of proof at the penalty phase of a capital trial, it nevertheless was prejudicial error for the trial court to fail to instruct the jury that neither party bears a burden of proof at that phase of the trial.  "[E]xcept for prior violent crimes evidence and prior felony convictions under section 190.3,

factors (b) and (c), the court need not instruct regarding a burden of proof, or instruct the jury that there is no burden of proof at the penalty phase." (*People v. Cruz* (2008) 44 Cal.4th 636, 681 (*Cruz*); see also *Tuilaepa, supra,* 512 U.S. at p. 979 [jury "need not be instructed how to weigh any particular fact in the capital sentencing decision"].)

Written or other specific findings by the jury regarding the aggravating factors are not constitutionally required. (E.g., *Friend, supra,* 47 Cal.4th at p. 90.)

There is no constitutional requirement that California's death penalty sentencing scheme provide for intercase proportionality review. (*Moon, supra,* 37 Cal.4th at p. 48; see also *Pulley v. Harris* (1984) 465 U.S. 37, 50-51 [federal Constitution does not require state courts to conduct intercase proportionality review in the administration of the death penalty].)

"Allowing consideration of unadjudicated criminal activity under [§ 190.3] factor (b) is not unconstitutional and does not render a death sentence unreliable. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 729.)

The use of adjectives such as "extreme" in section 190.3, factors (d) and (g), or "substantial" in section 190.3, factor (g), does not serve as an improper barrier to the consideration of mitigating evidence. (E.g., *Cruz, supra,* 44 Cal.4th at p. 681.)

The trial court was not required to instruct the jury as to which of the listed sentencing factors are aggravating, which are mitigating, and which could be either mitigating or aggravating, depending upon the jury's appraisal of the evidence. (E.g., *People v. Manriquez* (2005) 37 Cal.4th 547, 590; see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 509 (*Hillhouse*) ["The aggravating or mitigating nature of the factors is self-evident within the context of each case."].) Additionally, "the statutory instruction to the jury to consider 'whether or not' certain mitigating factors were present did not unconstitutionally suggest that the

absence of such factors amounted to aggravation." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 228.) Rather, we repeatedly have held that "CALJIC No. 8.85 is both correct and adequate." (*People v. Valencia* (2008) 43 Cal.4th 268, 309.)

Because capital defendants are not similarly situated to noncapital defendants, California does not deny capital defendants equal protection by providing certain procedural protections to noncapital defendants that are not provided to capital defendants. (E.g., *Cruz, supra,* 44 Cal.4th at p. 681.)

We again reject the argument that California's death penalty scheme is contrary to international norms of humanity and decency, and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution. (*People v. Avila, supra,* 46 Cal.4th at p. 725.) "International law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*Hillhouse, supra,* 27 Cal.4th at p. 511.) Because we conclude that defendant's sentence was rendered in accordance with those requirements, we need not consider whether alleged violations of such requirements also would violate international law. (*Brown, supra,* 33 Cal.4th at pp. 403-404; *People v. Bolden* (2002) 29 Cal.4th 515, 567.) We also reject the argument that the use of capital punishment "as regular punishment" violates international norms of humanity and decency and hence violates the Eighth Amendment of the United States Constitution. " . . . California does not employ capital punishment in such a manner. The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. [Citations.]" (*Demetrulias, supra,* 39 Cal.4th at pp. 43-44.)

### D. Correcting the Abstract of Judgment

Defendant claims, and the People agree, that the abstract of judgment must be corrected, because it does not accurately reflect the actual sentence of 25 years to life, plus an additional five years, imposed by the trial court for the arson count. A review of the record confirms that defendant's claim has merit.

As noted, the jury found defendant guilty of count II, the arson of Eddings's home, and also found true various sentencing enhancement allegations — that defendant had two prior "strikes" within the meaning of sections 667, subdivisions (c) and (e), and 1170.12, subdivision (c), had two prior serious felony convictions within the meaning of section 667, subdivision (a), and had served a prior prison term within the meaning of section 677.5, subdivision (b). At the sentencing hearing, the trial court imposed the sentence on count II as follows: "In this matter, certain prior offenses were alleged and proven. In particular, a first and second special prior offense was alleged pursuant to Penal Code Section 667(c) and (e) and 1170.12(c). Both of these convictions related to the assault with intent to commit rape and the forcible oral copulation on Toni [P.], a conviction which you suffered back in 1990. [¶] Because those prior offenses have [been] found to be true, the Court imposes under Count II the sentence of 25 years to life imprisonment. [¶] For the first, second, and third prior convictions which were alleged in this case, the Court would note that they are convictions for the same offense as under the first and second special prior, and under the provisions of Penal Code Section 667.5(b), the Court imposes a sentence of one year, and I order that stayed pending the completion of the term. [¶] With regard to the first and second prior offenses which are alleged pursuant to 667(a), insofar as they involve the same offense, the Court imposes the mandatory term of five years on each of those, but I order the second five-year term stayed insofar as it arises out of the same facts and circumstances. [¶] The indeterminate term,

112

therefore, under Count II is 25 years to life with an additional determinate term of five years pursuant to 667(a)." The various abstracts of judgment, however, including the amended abstract of judgment, incorrectly reflect a sentence of an indeterminate term of 25 years to life, plus an *eight*-year determinate term, for count II.

It is well settled that "[a]n abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize. [Citation.]" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) When an abstract of judgment does not reflect the actual sentence imposed in the trial judge's verbal pronouncement, this court has the inherent power to correct such clerical error on appeal, whether on our own motion or upon application of the parties. (See *ibid.*) We therefore order that the abstract of judgment be corrected to conform to the actual sentence imposed by the trial court on count II, namely, an indeterminate term of 25 years to life, with an additional determinate term of *five* years. (See, e.g., *People v. Boyde* (1988) 46 Cal.3d 212, 256.)

### III. DISPOSITION

For the reasons discussed above, we affirm the judgment in its entirety. With respect to the abstract of judgment, however, we order that it be corrected to conform to the trial court's oral judgment pronounced as to count II (arson) of an indeterminate term of 25 years to life, with an additional determinate term of five years.

**CANTIL-SAKAUYE, C. J.**

**WE CONCUR:**

KENNARD, J.
BAXTER, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Jones
_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S076721
**Date Filed:** May 7, 2012
_____

**Court:** Superior
**County:** Riverside
**Judge:** Robert G. Spitzer

_____

**Counsel:**

Kimberly J. Grove, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Kamala D. Harris, Attorneys General, Mary Jo Graves, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kimberly J. Grove
P.O. Box 425
Ligonier, PA  15658
(724) 238-3497

A. Natasha Cortina
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2220